# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### (HEARD AT COLUMBIA)

FILED

December 15, 1997

Cecil W. Crowson
Appellate Court Clerk

|  |  |  |
|---|---|---|
| STEVE HENLEY, | ) | FOR PUBLICATION |
|  | ) |  |
| Appellee, | ) | **Filed: December 15, 1997** |
|  | ) |  |
| v. | ) | JACKSON CRIMINAL |
|  | ) |  |
| STATE OF TENNESSEE, | ) | Hon. J.O. BOND, Judge |
|  | ) |  |
| Appellant. | ) |  |
|  | ) |  |
|  | ) | No. 01S01-9703-CC-00056 |

For the Appellant:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

John H. Baker, III
Assistant Attorney General
Nashville, Tennessee

Tom P. Thompson
District Attorney General

John Wooten
Assistant District Attorney General
Hartsville, Tennessee

For the Appellee:

Jack E. Seaman
Lyell, Seaman & Shelton
Nashville, Tennessee

Paul S. Davidson
Stokes & Bartholomew

# O P I N I O N

COURT OF CRIMINAL APPEALS
REVERSED; TRIAL COURT JUDGMENT
REINSTATED; PETITION DENIED.

DROWOTA, J.

In this post conviction proceeding, the trial court denied relief on all grounds alleged, and specifically found that the petitioner, Steve Henley, had been afforded his constitutional right to effective assistance of counsel at the sentencing phase of his capital trial. The Court of Criminal Appeals found that the evidence preponderated against the trial court's denial of relief with respect to the sentencing phase, and concluded that Henley had been denied his right to effective assistance of counsel because trial counsel had failed to adequately investigate and prepare witnesses to testify on Henley's behalf and had failed to adequately investigate Henley's mental condition and request that he undergo a mental evaluation. Accordingly, the Court of Criminal Appeals reversed Henley's sentence of death and ordered a new sentencing hearing. Thereafter, we granted the State permission to appeal to determine whether the intermediate court erred in concluding that the evidence preponderates against the trial court's finding that Henley was afforded his right to effective assistance of counsel at sentencing. After carefully reviewing the record, we have determined that the evidence supports the trial court's finding. Accordingly the judgment of the Court of Criminal Appeals ordering a new sentencing hearing is reversed, and the trial court's decision denying the petition for post conviction relief on all grounds alleged is reinstated.[1]

## BACKGROUND

In 1986, the petitioner was convicted of aggravated arson and two counts of first degree premeditated murder for the killings of Fred and Edna Stafford, an elderly couple who were close neighbors to Henley's grandmother. According to the

_____

[1]Oral arguments were heard in this case on October 8, 1997 in Columbia, Maury County, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

testimony of his co-defendant, Terry Flatt, the petitioner ordered both victims inside their home, shot them multiple times, and set their house on fire. The proof introduced at trial to establish the defendant's guilt was summarized by this Court on direct appeal as follows:

> [T]he evidence showed that Fred and Edna Stafford lived on Pine Lick Creek Road in Jackson County, just a short distance from the farm, owned by Henley's family, where his grandmother lived. On the day of the Staffords' death Henley had visited his grandmother and obtained some mechanical parts for some work he was doing. Flatt was with him. Earlier in the day they had been driving about, tending to business affairs of Henley's. During that time they had consumed some beer and also had taken some drugs, referred to in the record as Dilaudids. According to Flatt, as they passed the Staffords' residence Henley commented, 'there was some people that lived on that road that owed his grandmother or grandfather some money, and they done him wrong, his grandparents wrong years before, and he was going to stop and see about collecting some money off them.' Henley let Flatt out of the truck just before he reached his grandmother's house. When he returned five or ten minutes later he had a .22 rifle with him. They stopped fifty or seventy-five yards up the road where Henley loaded some more shells into the rifle. He also filled a plastic jug with gasoline from a five-gallon can he had in the back of the truck. They proceeded on toward the Stafford residence. When they reached there Mr. and Mrs. Stafford were standing on the left-hand side of the road looking at a small bridge where some construction work had recently been done, Henley stopped the truck, jumped out and told them, 'I want your money, if you don't give it to me this man in the truck here, he's going to kill me.' He then directed them to go to the house. Mr. Stafford said, 'Steve, if you want money or something, I got $80, maybe $100, you can have it.' He forced them on to the house at gunpoint and told Flatt to bring the .22 rifle as he followed behind them. When they got within 20 or 30 feet of the house he told Flatt to give him the rifle and go back to the truck and get the plastic jug of gasoline. Flatt did as directed. As he reached the porch he saw Henley begin to shoot. He first shot Mr. Stafford then turned and shot Mrs. Stafford a time or two. While she was laying on the floor moaning and groaning he threw the rifle to Flatt, took out his pistol and shot her again with the pistol. He told Flatt to pour out some of the gas. Flat endeavored to do as he was told and poured out a small amount. When he could not finish Henley took the container of gas from him and finished pouring it out. He then directed Flatt to light it. When Flatt said he could not he struck the match and as the flames went up they ran to the truck.

> The house burned to the ground. The bodies of the Staffords were found in the ashes. All that remained of Mr. Stafford's body was

part of the right leg and the trunk area. The body of Mrs. Stafford was similarly burned. It was determined that Mr. Stafford died from a gunshot wound to the chest with the bullet passing through his heart. Mrs. Stafford's death was caused by burns and inhalation of noxious gases from the fire. It was the opinion of the medical examiner that Mrs. Stafford lived a minute or longer after the fire began.

State v. Henley, 774 S.W.2d 908, 912 (Tenn. 1989).

At trial Henley maintained his innocence and attempted to discredit the prosecution's evidence, particularly the testimony of co-defendant Flatt which was crucial to the State's case. The defense showed that by testifying, Flatt had gained the benefit of a plea bargain agreement, pursuant to which, Flatt had been allowed to plead guilty to two counts of second degree murder, two counts of armed robbery and one count of aggravated arson. Flatt was sentenced as a Range I offender to twenty-five years for each of the murders, ten years for each of the robberies, and ten years for the arson, all to run concurrently, for an effective sentence of twenty-five years.

Testifying in his own defense, Henley adamantly denied all knowledge of and involvement in the murders and arson. Henley acknowledged that he had spent the day in the company of Flatt, and he admitted that he had drank some beer. However, Henley flatly denied that he was intoxicated or under the influence of drugs. Henley said he did not like to drink beer and had never abused drugs. Henley testified that it was Flatt who was intoxicated and under the influence of the drug referred to in the record as Dilaudid. Henley said that he dropped Flatt off before arriving at his grandmother's house because of Flatt's intoxicated condition. Flatt left the truck with Henley's .22 gauge rifle planning to hunt rabbits. Henley said he

-4-

proceeded to his grandmother's house and remained there for about forty-five minutes to an hour. Henley picked Flatt up when he left, but had no knowledge of Flatt's activities during the intervening time frame. Henley claimed that he did not see the fire at the Staffords' home and was not aware of their deaths until the next day. On cross-examination, Henley admitted that he previously had pleaded guilty to transporting stolen goods in interstate commerce. In addition, Henley admitted that he owed a substantial farming debt near the time of the killings and had filed for bankruptcy.

The defense called other witnesses during the guilt phase to corroborate Henley's testimony about his activities on the day of the murders and to provide background information about Henley's life. Henley's grandmother testified that around the time of the murders, Henley arrived at her home alone and stayed there for forty to forty-five minutes. On cross-examination, she admitted that she had seen Henley with the .22 rifle on Saturday before the Staffords were murdered on Wednesday.

After the jury convicted Henley of two counts of premeditated murder and arson, the case proceeded to sentencing. The State relied upon the proof it had presented at the guilt phase.

The defense offered further proof, first calling Henley's mother, who, in the presence of the jury said, "I want to talk to you Mr. Reneau." Defense counsel, J.H. Reneau, III, requested and was granted a short recess. He exited the courtroom with Dorothy Henley. When the sentencing hearing resumed, she did not take the stand,

and the jury was not given an explanation for her failure to testify. Instead, the defense recalled Bertha Henley, the petitioner's seventy-five-year-old grandmother who testified that Henley, along with his parents, had lived in her household from the time he was born until he was two years old. In addition, Henley had spent every weekend and summer vacation thereafter in her home until he completed high school. She said that Henley had a very close relationship with his grandfather, and that, from a very young age, Henley had helped his grandfather with farm work. She described Henley as a "good child" who "minded" her well and who "always loved" her. Henley married when he was eighteen-years-old, and had two children, Gregg and Leanne. Even after his marriage, however, Henley's close relationship with his grandparents continued. Though he and his family moved from Tennessee to Maryland, Henley returned to Tennessee when his grandfather was diagnosed with cancer in May of 1976 and lived with his family in a trailer across from his grandparents' home so that he could help his grandfather with the farm work. After his grandfather died of cancer in July of 1976, Henley began working on the family farm full time and continued in that occupation from 1977 to 1983. During that time, Henley visited his grandmother almost everyday, and continued to check on her regularly thereafter. She could not drive because she had suffered a heart attack, so Henley would drive her to the doctor and into town once a week to pay bills and buy groceries. Henley's grandmother described him as a "tender hearted" person who would cry when his feelings were hurt. She said he had always been kind and good to her, ever willing to provide her with needed assistance. She told the jury that she loved Henley, the eldest of her four grandchildren, and did not want to see anything happen to him. The State did not cross examine Bertha Henley at the sentencing hearing.

Henley also testified about his relationship with his grandparents and how he had played and worked on the farm from a very young age. When asked why he stayed with his grandparents, rather than his parents, on the weekends and during his summer vacations, Henley replied, "I'd just love them more than anything in the world. There's no way to explain my grandaddy, I don't guess. He was just the best person in the world." Henley recounted how he had given up his job in Maryland as a certified marine mechanic to return to Tennessee and assist his grandfather when he was diagnosed with cancer. Henley said he worked full time on the family farm from 1977 to 1983, and was successful for a time. His farming difficulties began with a drought in 1980 or 1981. To compensate for losses during the drought, he planted nearly seven hundred acres of wheat. Because of severe flooding, Henley was unable to harvest the wheat and lost his entire crop and ultimately was forced to file for bankruptcy protection. When trial counsel gave Henley the opportunity to make a final comment to the jury, Henley told the jurors, "I think each and everyone of you has made a mistake, and it's a mistake you all will have to live with. And one day and time when we're all, wherever we go, we'll all have to face that." The State did not cross examine Henley at the sentencing hearing.

After hearing the proof, the jury sentenced Henley to death for both murders, finding that each murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(I)(5) (1982). This Court affirmed the convictions and sentences on direct appeal. State v. Henley, 774 S.W.2d 908 (Tenn. 1989).

Thereafter, Henley instituted this action seeking post conviction relief. Among

other things, Henley alleged that he was denied his constitutional right to effective assistance of counsel at the sentencing phase of his capital trial. Henley alleged that trial counsel's failure to investigate and prepare family members to testify on his behalf deprived the jury of hearing proof of his good character and non-violent nature. In addition, Henley alleged that trial counsel's failure to completely investigate his mental condition and request a mental evaluation constituted ineffective assistance of counsel. At the time of the evidentiary hearing on the petition, both the original trial judge, Robert H. Bradshaw, and the sole trial defense attorney, J.H. Reneau, III, were deceased.

In support of his first claim, Henley offered the testimony of his mother, his two sisters, his two children, and his second wife. Dorothy Henley, the petitioner's mother, said that trial counsel had not contacted her prior to trial and that the only time he had spoken to her about testifying was during the recess she requested after he had called her to the witness stand at the sentencing hearing in the presence of the jury. Mrs. Henley admitted that she told trial counsel during the recess that she did not want to testify, but said she had refused to testify only because she had not understood the purpose of her testimony nor what she would have been expected to say on the witness stand. Had trial counsel explained to her the purpose of her testimony before the sentencing hearing, Mrs. Henley claimed she would have testified on behalf of her son.

Had she been properly prepared, Mrs. Henley said that she would have given testimony about her son's life, her love for him, and her belief that he would not have committed the crimes "if he was at his right mind." She would have told the jury that

Henley was a good son who had a close relationship with his grandparents and who had suffered financial losses because of the failure of his farming operation. On cross-examination, Mrs. Henley acknowledged that she had lived in Davidson county at the time of the murders and that she had little contact with her son during the year preceding the homicides. She conceded that she had no more information about Henley's background than what his grandmother had testified about at the sentencing hearing.

The petitioner's children, Greg and Leanne Henley, testified that they were not told about the petitioner's trial until it had concluded. These witnesses said that, had they been contacted by trial counsel, they would have given evidence that Henley was a good father. Greg was twelve or thirteen years old at the time of the trial and Leanne was ten or eleven years old. At the time of Henley's trial, both children lived with their mother, Henley's first wife. In an affidavit offered by the petitioner at the evidentiary hearing, their mother stated that she would have allowed the children to testify if she had been contacted by trial counsel.

Stefanie Robinson, the petitioner's younger sister testified that she had not been contacted by trial counsel, but said, had she been afforded the opportunity, she would have told the sentencing jury that Henley was a good brother and that he had been very upset when he could not pay the money he had borrowed against the family farm. According to Robinson, Henley was not a violent person. On cross-examination, Robinson admitted that she had seen the petitioner drink beer and smoke marijuana.

Patricia Woodard, the petitioner's older sister, said that she would have been willing to testify on Henley's behalf had she been contacted by trial counsel. Woodard would have told the jury that the petitioner had taught her to ride a bicycle when they were young, and that she had never seen the petitioner become violent. On cross-examination, Woodard admitted that she had lived in Carthage, Tennessee, for five years prior to the murders and had not spent a great deal of time with the petitioner in the years preceding his arrest and trial.

Cynthia Brown, the petitioner's second wife testified that, had she been contacted by trial counsel, she would have testified in Henley's behalf and told the jury that she had never seen Henley exhibit violent behavior and that he had been very kind to her son by a previous marriage and had intended to adopt the boy. On cross-examination, Brown admitted that Henley drank alcohol and used marijuana during their marriage.

With respect to the petitioner's second claim that trial counsel should have further investigated his mental condition, Henley offered the testimony of attorney Robert Massey who said that trial counsel should have engaged an independent psychologist to assist in the document gathering process and to do an examination of those documents to determine whether or not there would be any mitigation evidence that might be presented from those documents to the jury at the penalty phase. Mr. Massey had tried one death penalty case at the time of offering this testimony and had settled six others. He had never tried a case in Jackson county, nor had he been acquainted with the petitioner's original trial counsel.

The petitioner also offered the testimony of Dr. William D. Kenner, a psychiatrist who had interviewed Henley once for two hours in August of 1992, reviewed the results of tests administered by a licensed clinical psychologist, reviewed the interviews of family members conducted by post conviction counsel, and reviewed the trial testimony of Henley and co-defendant Flatt. Dr. Kenner had not spoken directly with Henley's family, nor reviewed the entire trial transcript, nor asked Henley to recount what trial counsel had talked about with him. Dr. Kenner did not question Henley's competency to stand trial, but said that Henley had been depressed at the time of the homicides because of his farming failures and may have been "self-medicating" by using alcohol and drugs. On IQ tests given, Dr. Kenner said that Henley had scored in the average range with a performance score of 109, a verbal score of 94, and a full scale score of 99. According to Dr. Kenner, such a divergence between the performance score and the verbal score is often indicative of a learning disability. According to Dr. Kenner, a learning disability could have caused Henley to have difficulty managing his finances and could have been the actual cause of Henley's farming failures. Dr. Kenner also said that because of Henley's close relationship with his grandfather, losing the family farm was the equivalent to Henley of his grandfather dying a second time.

Finally, Henley testified at the post conviction hearing. On direct examination, Henley denied having any meaningful consultation with Reneau. Henley said that Reneau never asked him for a history of his life or for any personal records such as school or medical records. Henley also said that Reneau had not spoken with any of his family members about testifying at the sentencing hearing. The petitioner admitted that he had never asked his family members to testify in his behalf. Finally,

Henley continued to maintain that he was innocent of the crimes for which he had been convicted and sentenced to death.

Upon hearing the proof, the trial judge denied the petition for post conviction relief on all grounds alleged. Though the trial court made no explicit finding with respect to the claim that trial counsel was ineffective because he failed to investigate Henley's mental condition and request an evaluation, with respect to Henley's claim that trial counsel should have prepared more witnesses for the sentencing phase, the trial court stated:

> Heard a lot of witnesses about the sentencing phase. If there's any part of it that really -- kind of bothers me a little bit, it's the sentencing phase, and I'll have to state that. I would have like to have had another witness maybe to have been put on. I would like for the mother to have testified when she refused. Now whether he had talked to her two days ahead of time or that day it really doesn't make much difference. If they went in the back room and he talked to her and she still didn't want to testify, maybe she had a reason. Maybe she had a reason then that she doesn't have now, I don't know. I do know this, the attorney asked her. So he come back and got the grandmother and she testified, and I thought did a beautiful job as far as words, the way they read. She answered the questions, she took him through his life, she told it. And the jury had basically everything that these witnesses the last two days have talked about in that record before them. They didn't have the numbers of people saying this, but they all knew about his family. They all knew about his grandmother, his granddaddy, they knew all about these things, it was all there. It wasn't repeated over and over by several people, but they did have that in the case when they looked at it. But again, I would have like to have seen another witness or two, but that's trial strategy. He may have thought that's enough. She may have done such a good job that he thought this is the best I'm going to get. That was the choice to make.

The petitioner appealed and the Court of Criminal Appeals held that the evidence preponderated against the trial court's finding that Henley had been afforded his right to effective assistance of counsel at the sentencing phase of the trial. Specifically, the Court of Criminal Appeals found that counsel's failure to

-12-

adequately investigate and prepare witnesses to testify on Henley's behalf and to adequately investigate Henley's mental condition resulted in a denial of Henley's right to effective assistance of counsel at sentencing. Accordingly, the Court of Criminal Appeal's reversed Henley's death sentence and remanded for a new sentencing hearing.

Thereafter, we granted the State's application for permission to appeal to determine whether the Court of Criminal Appeals erred in concluding that the evidence preponderates against the trial court's finding that Henley was afforded his constitutional right to effective assistance of counsel at the sentencing hearing. For the reasons that follow, we reverse the judgment of the Court of Criminal Appeals and reinstate the judgment of the trial court denying post conviction relief.

## STANDARD OF APPELLATE REVIEW

In resolving the issues in this appeal, we are guided by certain well-settled rules. The burden was on the petitioner at the evidentiary hearing to prove his case by a preponderance of the evidence. Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); Cooper v. State, 847 S.W.2d 521, 527 (Tenn. Crim. App. 1992). The findings of fact of the trial judge on a petition for post conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings. Tidwell, 922 S.W.2d at 500; Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). In evaluating whether the evidence preponderates against the trial court's findings, we are guided by longstanding rules of appellate procedure. Appellate courts in this State do not reweigh or reevaluate the evidence. We can not substitute

-13-

our inferences for those drawn by the trial judge. Moreover, questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. Finally, the party seeking to overturn the findings of the trial judge bears the burden on appeal of demonstrating why the evidence contained in the record preponderates against the findings of the trial judge. Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966); Cooper, 847 S.W.2d at 527; Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). It is with these principles in mind that we evaluate the findings of the trial court and the Court of Criminal Appeals with respect to the petitioner's claim of ineffective assistance of counsel at sentencing.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Legal Standards

Article I, Section 9 of the Tennessee Constitution provides "that in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel... ." Similarly, the Sixth Amendment[2] to the Constitution of the United States guarantees that in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." These constitutional provisions afford to the accused in a criminal prosecution the right to effective assistance of counsel. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975) and Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a denial of the right, a petitioner bears the burden of proving both that counsel's performance was deficient

---

[2]The Sixth Amendment is applicable to the states through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

and that the deficiency prejudiced the defense. <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996); <u>Strickland</u>, 466 U.S. at 687, 104 S.Ct. at 2064.

With respect to the first prong of the claim, we recognized early on that counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases. <u>Baxter</u>, 523 S.W.2d at 936; <u>see</u> <u>also</u>, <u>Goad</u>, 938 S.W.2d at 369. To prove a deficiency, therefore, the petitioner must show that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms. <u>Goad</u>, 938 S.W.2d at 369; <u>Strickland</u>, 466 U.S. at 688, 104 S.Ct. at 2065. When assessing an attorney's performance it is not our function to "second guess" tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by "20-20 hindsight." <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982). As the United States Supreme Court has recognized,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

<u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. at 2065; <u>see</u> <u>also</u> <u>Burger v. Kemp</u>, 483 U.S. 776, 789, 107 S.Ct. 3114, 3123, 97 L.Ed.2d 638 (1987). When reviewing the facts and circumstances of a case, therefore, a "fair assessment. . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. at 2065; <u>see</u> <u>also</u> <u>Goad</u>, 938 S.W.2d at 369.

To establish the second prong of the claim -- that counsel's deficiency resulted in prejudice to the defense -- a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068; see also Goad, 938 S.W.2d at 370. When challenging a death sentence, a petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069.

In determining whether a petitioner has discharged the burden of establishing prejudice, a court

> must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect. . . .

Strickland, 466 U.S. at 696-97, 104 S.Ct. at 2069; see also Goad, 938 S.W.2d 371. Where, as here, the alleged deficiency involves counsel's failure to present mitigating evidence in the penalty phase of a capital trial, in assessing prejudice under Strickland, several factors are significant, including whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; the nature and extent of the mitigating evidence that was available but not presented; and whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination.

-16-

Goad, 938 S.W.2d at 371 (citing cases).

Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component. Strickland, 466 U.S. at 697, 104 S.Ct. at 2069; Goad, 938 S.W.2d at 370.

Applying the principles outlined above, we must now determine whether the evidence in the record preponderates against the trial court's finding that the petitioner failed to establish that he was denied his constitutional right to effective assistance of counsel.

**B. Failure to Prepare/Call Other Witnesses**

Though the trial court did not use the term, it is evident from its finding that the trial court concluded that the petitioner had failed to establish prejudice resulting from counsel's alleged failure to prepare and call witnesses. In denying post conviction relief, the trial judge observed that the sentencing jury "had basically everything that these witnesses the last two days have talked about in that record before them."

In reversing the decision of the trial court, the Court of Criminal Appeals stated, "[w]e do not think it is assuming too much to conclude that a jury is going to be prejudiced against a defendant upon that person's own mother refusing to testify on his or her behalf." As evidence of prejudice, the intermediate court quoted from

-17-

the affidavit of a juror which was submitted as part of the petitioner's offer of proof at the post conviction hearing in which the juror said, "If a man's own mother won't testify on his behalf then we know what we've got to do." In addition, the intermediate court stated that, "[e]ven without this offer of proof, we hold that the dearth of favorable testimony offered at the sentencing hearing, when significant amounts of favorable testimony were available establishes a reasonable probability that, but for Mr. Reneau's deficient performance with respect to the sentencing hearing of Henley's trial, the result of the proceeding would have been different."

Initially we note that the juror's affidavit statement regarding the effect on the sentencing jury of Dorothy Henley's failure to testify should not have been considered by the intermediate appellate court as proof of prejudice. Indeed, the affidavit should not have been considered for any purpose. Rule 606(b) of the Tennessee Rules of Evidence, expressly prohibits a juror from testifying or offering an affidavit "as to any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict . . .*" (Emphasis added.) In this case, the juror's affidavit related to the precise subject matter about which a juror is strictly forbidden from testifying by Rule 606(b) -- the effect of the mother's failure to testify on the jury verdict. The affidavit violates the express terms of Rule 606(b) and should not have been considered by the intermediate court as evidence of prejudice. See State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994)

Moreover, Henley's mother did not refuse to testify in the presence of the jury. Instead, she asked to first speak with trial counsel. Although the record reflects that

she thereafter did not testify, at no time did she openly refuse to testify on Henley's behalf in the presence of the jury as the Court of Criminal Appeals decision indicates. In addition, the fact that the jury was not provided with an explanation as to why Dorothy Henley did not testify does not justify a finding of prejudice. The jury was instructed to base its sentencing decision on the evidence presented at trial, not upon speculation about why a particular witness did not testify. Jurors are presumed to follow the instructions given them in arriving at a verdict. State v. Laney, 654 S.W.2d 383, 389 (Tenn. 1983); State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). Therefore, it is not appropriate to "assume" the defense was prejudiced because Henley's mother was not called as a witness in his behalf at the sentencing hearing. The fact that Dorothy Henley asked to speak with counsel when called as a witness and thereafter did not testify does not constitute a reasonable probability sufficient to undermine confidence in the outcome of the proceeding

Finally, the record does not support the Court of Criminal Appeals' statement that prejudice was established because there was a "dearth of favorable testimony offered at the sentencing hearing, when significant amounts of favorable testimony were available." As was previously stated, when assessing the existence of prejudice in the face of an alleged deficiency involving counsel's failure to present mitigating evidence in the penalty phase of a capital trial, we consider whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; the nature and extent of the mitigating evidence that was available but not presented; and whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad, 938 S.W.2d at 371 (citing cases).

-19-

In this case, the record fully supports the trial court's statement that, through the testimony of Bertha Henley and the petitioner, the original sentencing jury had before it basically the same favorable mitigation evidence that was offered by the many witnesses at the evidentiary hearing on the post conviction petition. As previously summarized herein, the jury heard extensive testimony about Henley's relationship with his grandparents, including his own testimony that he loved them more than anyone else in the world. It is difficult to imagine a more favorable and detailed description of the petitioner's character than that given by Bertha Henley. It is clear from the proof at trial and the evidentiary hearing in this case that the petitioner had a closer relationship with his grandmother, Bertha Henley, than with any other living family member. Indeed, the petitioner's own mother acknowledged that she could have offered no further information about Henley and his life than that given by Bertha Henley at the sentencing hearing.

Dorothy Henley admitted that in the years preceding the murders she had resided in Davidson County and had little contact with her son. On cross-examination, Dorothy Henley also admitted that she visited her son only a few times in jail before his trial. Overall, Dorothy Henley used very general terms to describe her relationship with her son. Similarly, Henley's older sister gave only general information about the petitioner, and conceded that she had little contact with her brother during the five years preceding the homicides.

While Henley's younger sister and second wife had closer associations with him near the time of the murders, both also had personal knowledge about his use of drugs, specifically marijuana, which was brought out during cross-examination at

-20-

the evidentiary hearing. Had these two witnesses testified at the sentencing hearing, that same information, no doubt, would have been brought to light. In view of Henley's testimony throughout the trial that he had never abused drugs, the testimony of two family members to the contrary would have been extremely detrimental to the defense.

The only other testimony offered at the evidentiary hearing was that of Henley's children who claimed they would have testified had trial counsel contacted their mother with whom they were residing. However the children, eleven and thirteen years old at the time of the trial, admittedly were not informed about the trial until its conclusion.

Therefore, the witnesses which were available but not called as witnesses at the original trial, would have offered general, vague testimony about the petitioner's character, and the evidence regarding the petitioner's use of drugs and alcohol was unfavorable. Moreover, none of these witnesses had a particularly close relationship with the petitioner near the time of the killings. In contrast, the mitigating proof actually presented was detailed, poignant, and favorable and was provided by the petitioner and his grandmother, with whom he had a close relationship. It is significant that the State did not cross examine either the petitioner or his grandmother at the sentencing hearing.

Clearly, trial counsel has a duty to investigate and prepare for the penalty phase of a capital trial since "evidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal

acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 544, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987). However, in this case, the proof does not preponderate against the trial court's finding that the petitioner suffered no prejudice even assuming trial counsel failed to competently fulfill that duty. Nothing was adduced at the post conviction hearing which could possibly have added anything favorable to the mitigation proof that was offered at the original trial by the petitioner and his grandmother. Though the petitioner offered a large number of witnesses who claimed they would have testified on his behalf at the sentencing hearing but for counsel's incompetence, the quality of their testimony was weakened either by their limited relationship with Henley at the time of the murders or by their personal knowledge of his drug use at the time of the murders. As the trial judge implicitly found, the testimony offered at the post conviction hearing was, at most, cumulative. State v. Melson, 772 S.W.2d 417, 419 (Tenn. 1989). Appellate courts must consider the quality of the proposed testimony rather than the quantity of witnesses when determining whether prejudice has been established. Finally, proof of the aggravating circumstance in this case, that the murders were "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," Tenn. Code Ann. § 39-2-203(I)(5) (1982), was strong. The victims were forced at gunpoint from the road to their home. The wife watched as her husband was shot. She was then shot several times, but, according to the testimony at trial, she remained alive and conscious for a time after the fire had begun, and actually died of smoke inhalation. In our view, the petitioner has not established the existence of a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not

warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069.

## C. Failure to Investigate Mental Condition and Request Evaluation

The Court of Criminal Appeals also found that the evidence preponderates against the trial court's denial of Henley's claim that counsel inadequately investigated the petitioner's mental condition and failed to request a mental evaluation.

At the evidentiary hearing, Henley offered the testimony of Dr. Kenner who said that Henley lost the family farm because he had a learning disability and was a bad manager and that Henley was depressed about the loss of the family farm and was "self-medicating" with alcohol and drugs near the time of the homicides. Based upon Dr. Kenner's testimony, Henley claimed that had trial counsel properly investigated his mental condition and requested that he undergo a mental evaluation, Reneau would have learned of this mitigating proof and presented it at the sentencing hearing. In reversing the trial court's denial of relief, the Court of Criminal Appeals implicitly found that trial counsel had been deficient in failing to investigate and offer this proof and that the deficiency has resulted in prejudice to Henley. We disagree.

While it is true that often a greater duty of inquiry into a client's mental health is imposed for the penalty phase of a capital trial, Goad, 938 S.W.2d at 370, it is also well-established that

> the reasonableness of counsel's actions may be determined or
> substantially influenced by the defendant's own statements or actions...
> And when a defendant has given counsel reason to believe that
> pursuing certain investigations would be fruitless or even harmful,
> counsel's failure to pursue those investigations may not later be

-23-

challenged as unreasonable.

Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.

At the trial of this case, the defendant maintained his innocence, flatly denied that he had been intoxicated on the day of the murders, and also denied ever abusing drugs. Moreover, Henley said his farming operation had failed because of unpredictable weather, a drought followed the next year by floods. Clearly then, the evidence for which trial counsel is now faulted for not discovering and introducing would have been inconsistent with the defendant's own testimony and harmful to the defense theory throughout the trial. When assessing the performance of trial counsel, courts must eliminate the "distorting effects of hindsight" and evaluate the challenged conduct from counsel's perspective at the time, rather than from the perspective of a mental health expert offering testimony in a post conviction proceeding. Applying that standard, it is clear that trial counsel's performance and investigation of Henley's mental condition was not deficient. Accordingly, the evidence does not preponderate against the trial court's denial of post conviction relief.

## CONCLUSION

After carefully reviewing the record, we have determined that the Court of Criminal Appeals erred in concluding that the evidence preponderates against the trial court's denial of post conviction relief. Accordingly, the judgment of the Court of Criminal Appeals reversing Henley's death sentence and ordering a new sentencing hearing is reversed, and the judgment of the trial court denying the petition for post

conviction relief is reinstated. The sentence of death shall be carried out as provided by law on the 27th day of April, 1998, unless stayed by this Court or other appropriate authority.

_____
FRANK F. DROWOTA, III,
JUSTICE

**Concur:**
Anderson, C.J.
Holder, J.


Reid, J. and Birch, J. dissent - See Separate Dissenting Opinion.