IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 15, 2005 Session

ANDREW CHARLES HELTON v. STATE OF TENNESSEE

Direct Appeal from the Criminal Court for Davidson County
No. 98-B-1052     Seth Norman, Judge

No. M2004-01015-CCA-R3-PC - Filed May 31, 2005

Petitioner, Andrew Charles Helton, filed a *pro se* petition for post-conviction relief, which was amended after appointment of counsel.  Following an evidentiary hearing, the trial court dismissed the petition.  On appeal, Petitioner argues (1) that the prosecutor misrepresented to the jury during closing argument evidence concerning the 911 tape; (2) that the prosecutor improperly pointed the murder weapon at the jury during closing argument; (3) that his trial counsel was ineffective for failing to object to the prosecutorial misconduct which occurred during closing argument; and (4) that his trial counsel provided ineffective assistance when he objected to the jury's request during deliberations to review the tape of a neighbor's call to the 911 operator on the night of the shootings.  After a thorough review of the record, we affirm the judgment of the post-conviction court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

Kathleen G. Morris, Nashville, Tennessee, for the appellant, Andrew Charles Helton.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; Pamela Sue Anderson, Assistant District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, the State of Tennessee.

OPINION
I. Background

Following a jury trial, Petitioner was convicted of the premeditated first degree murder of Robert Cole and the second degree murder of Michael Chatman.  He was sentenced to life imprisonment for the first degree murder conviction and twenty-three years for the second degree murder conviction.  The facts surrounding Petitioner's convictions were summarized by this Court in the direct appeal in *State v. Andrew Charles Helton*, No. M1990-01405-CCA-R3-CD, 2000 WL

1520018 (Tenn. Crim. App., at Nashville, Oct. 13, 2000), *perm. to appeal denied* (Tenn. Apr. 24, 2001), as follows:

Prior to the evening of November 28, 1997, the Defendant had known victim Michael Chatman for about eleven years. However, it was not until the Defendant got divorced that he and Chatman began to socialize on a regular basis. During the months before the killings, the Defendant testified that he and Chatman would see each other at least a couple of times a week. A few days before Thanksgiving, 1997, the Defendant testified that Chatman came to his house, pushed him against the wall, and accused the Defendant of trying to "cross him out with his girlfriend." A friend broke the fight up, and according to the Defendant, Chatman "broke down ... and started crying."

The next time the Defendant saw Chatman was on the evening of November 28, 1997. On that night, the Defendant was at home not feeling very well when Michael Chatman called and asked the Defendant to come over. The Defendant declined, and Chatman offered to come over and bring the Defendant some food. Chatman went to the Defendant's apartment with food and a bottle of Crown Royal whiskey. The two men drank for a short time and then decided to go out. They went to Shayne Cochran's house, and then all three men went to Bailey's Sports Bar in Rivergate. At Bailey's, the men met up with Robert Cole and decided to go to the home of Leslie Hebert, a friend of Cochran's. Allison Dowell and Hebert's roommate were also present when the men arrived. After staying at Hebert's house for awhile, the Defendant, Cochran, Chatman, Cole, Hebert, and Dowell went to an after-hours club downtown called "The Church."

When the group arrived at The Church, the Defendant took off his jacket and left it in the car that Chatman had been driving. The Defendant testified that the jacket contained approximately $200.00 in cash and a small amount of marijuana. At The Church, the Defendant became separated from the group. Thinking that the Defendant might have gone home, Cochran, Chatman, Cole, Hebert, and Dowell left The Church and went to the Defendant's apartment. Cochran hid a Crown Royal bag full of cocaine and pills behind one of the buildings at the Defendant's apartment complex and then retrieved it shortly thereafter. The group waited outside the Defendant's apartment for a brief period of time and then went to Chatman's apartment in Antioch.

When the group arrived at Chatman's apartment, Chatman's roommate took his car, which Chatman had been driving all evening, and went to work. Without a car, the two women had no way to get home so they paged the Defendant, hoping that he would take them home. The Defendant testified that he was on his way to his apartment in a cab he shared with Shirley Crowell, Chatman's ex-girlfriend whom the Defendant encountered at The Church, when he got a page from Cochran and

Chatman. The Defendant testified that he called Chatman's apartment, and Chatman asked him to come over because Hebert and Dowell needed a ride home. Crowell, who had recently broken up with Chatman, agreed to ride with the Defendant to pick up Hebert and Dowell, but said that she would not go inside.

The Defendant eventually arrived at Chatman's apartment and testified that he asked Chatman about his jacket that he left in the car. Chatman told the Defendant that Cochran had gotten the jacket out of the car and that it was in the living room. When the Defendant retrieved his jacket, he realized that several items, including $200.00 and some marijuana, were missing. The Defendant talked briefly with Cochran outside while Chatman went upstairs to change clothes. After changing clothes, Chatman came back downstairs about the time that the Defendant came inside.

Although the Defendant's story differs as to what occurred next, Hebert and Dowell testified that the Defendant began to accuse Chatman of stealing. Dowell testified that the Defendant and Chatman were arguing "kind of loud." Dowell also noticed that the Defendant had a gun strapped on his shoulder underneath his jacket. When Chatman denied the allegation, Hebert and Dowell testified that the Defendant pulled out a gun and shot Chatman. According to Hebert and Dowell, Chatman did not touch the Defendant before he started shooting. Hebert testified that the Defendant just began shooting for no apparent reason.

Soon after the Defendant began shooting, Hebert ran outside, and Dowell ran to the back of the apartment. Dowell testified that she saw the first shot and could hear more shots as she was running to the back of the apartment. At one point, Dowell testified that the Defendant walked to the back of the apartment where she was, looked at her for a moment, and then returned to the front of the apartment. In fear that she might be shot for hiding, Dowell went to the front of the apartment and saw the Defendant shoot Chatman one more time in the mouth. Dowell then ran outside and found Hebert hiding in the bushes.

Hebert testified that she was hiding outside with a view of the apartment. She saw Dowell run outside and saw Chatman lying on the floor and Cole sitting on the living room couch. Hebert testified that Cole remained sitting on the living room couch during the entire confrontation between the Defendant and Chatman. This is contradictory to the Defendant's testimony that Cole had been involved in the fight. The Defendant testified that Cole was pulling at the Defendant's pockets and claimed that he shot Cole only to make him let go.

After the killings, the Defendant and Cochran got into the Defendant's car. Cochran asked Hebert and Dowell to get in also. Hebert and Dowell got into the car and saw that Shirley Crowell was also present. After driving a short distance in the

parking lot, the Defendant returned to Chatman's apartment and retrieved Dowell's purse as well as the gun that he had used to shoot Chatman and Cole. Crowell made some threatening statements to Hebert and Dowell. Hebert testified that the Defendant told her and Dowell, "I am sorry y'all had to see that."

When police arrived at Chatman's apartment after the shooting, Chatman was found lying on the floor near the front door, and Cole was found lying on the living room couch. Both Chatman and Cole had been shot multiple times. The police were able to get a description of the Defendant's car from neighbors and within minutes were in pursuit. During the pursuit, Crowell threw the gun out of the car window. The Defendant, upon realizing that the police were behind him, put the car in neutral and got out of the car. Everyone fled from the car, except for Hebert, who jumped into the front seat to stop the car from rolling. All of the occupants of the car, including the Defendant, were found and taken into police custody. The police also found the nine millimeter semiautomatic handgun on a sidewalk near the Defendant's car.

Both victims were pronounced dead upon arriving at nearby hospitals. Autopsies performed on the victims revealed the following: (1) Chatman had a "contact" wound to his lower left abdomen, a "close-range" wound to his upper left abdomen, and a contusion to the right side of his head; (2) Cole had a "close-range" gunshot wound to the left eyebrow and additional gunshot wounds on the right side of the head and on the scrotum; and (3) both victims tested positive for cocaine, marijuana, and alcohol.

*Helton*, 2000 WL 1520018, at **1-3.

On appeal, Petitioner argued that the evidence was insufficient to sustain his convictions, and that the trial court erred in admitting certain photographs into evidence. *Id.* at *1. This Court upheld Petitioner's convictions on appeal, and the Supreme Court denied Petitioner's application for permission to appeal.

## II. Post-Conviction Hearing

Petitioner's trial counsel, the public defender, testified that he and two or three of his staff investigated Petitioner's case. He said that he initially considered raising a diminished capacity argument based on the amount of drugs and alcohol Petitioner and the other members of the group had consumed prior to the shootings. Trial counsel interviewed "a couple of" experts in this field but determined that their testimony would not be beneficial to the defense. Trial counsel said that he did not recollect Petitioner testifying on cross-examination that he was "clear headed" at the time of the shootings, but he conceded that it was a point that probably should have been addressed on redirect. In the end, trial counsel said that Petitioner agreed that his defense should be based on self-defense.

-4-

Trial counsel said that when he was informed after deliberations began that the jury wanted to review a 911 tape of a call by a resident of the apartment complex of the night of the shootings, his immediate response was to object to the request. Trial counsel said that he mistakenly thought that the caller had told the 911 operator that he heard gunshots after Petitioner returned to Mr. Chatman's apartment when, in fact, the caller did not mention hearing a second series of gunshots. Trial counsel said that if he had correctly remembered the substance of the tape, he would not have objected to the jury's request to review the tape. The State's theory of premeditation for Mr. Cole's shooting was based, in part, on the testimony of Leslie Hebert's and the 911 caller's wife that another round of gunshots occurred after Petitioner returned to Mr. Chatman's apartment.

Trial counsel said that he did not remember whether or not the murder weapon was tested for fingerprints. Trial counsel said that he saw the prosecutor pick up the gun at some point during her closing argument but did not see her point the gun at the jury. Trial counsel conceded, however, that he was not watching the prosecutor during all of her argument.

On cross-examination, trial counsel said that at the time of the post-conviction hearing he had practiced law for twenty-two years, primarily as a criminal defense attorney. He said that if there had been fingerprint evidence, he would have reviewed it. Trial counsel said that Petitioner maintained at trial that Mr. Chatman owned the murder weapon, and the State argued that the murder weapon was Petitioner's gun. Petitioner did not deny that he touched the gun that night, and trial counsel said that the presence or absence of Mr. Chatman's fingerprints on the gun would not have assisted in establishing that Petitioner acted in self-defense on the night of the shootings.

Trial counsel said that the decision of whether or not to let the jury review the 911 tape had to be made quickly. Trial counsel said that he did not know exactly why the jury wanted to listen to the 911 tape again during their deliberations, and he did not know if the absence of the tape had any impact on the jury's finding of premeditation in Mr. Cole's death. Trial counsel said that if he had seen the prosecutor point the gun at the jury during closing argument, he would have objected. He said that he did not hear the prosecutor pull the trigger of the unloaded gun. Trial counsel agreed that Petitioner's admission on cross-examination that he was "clear headed" when he shot Mr. Chatman and Mr. Cole did not give him a lot of flexibility even if he had questioned Petitioner further about the remark on redirect examination.

James Whiting, Petitioner's stepfather, said that the prosecutor was showing the jury photographs of the victims at the crime scene during closing argument when she picked up the gun, put the strap on her shoulder, and swung the barrel of the gun around the jury. Mr. Whiting said he did not hear the prosecutor pull the trigger, and he did not recall whether anyone was startled by the prosecutor's conduct.

Judith Whiting, Petitioner's mother, said that the prosecutor picked up the murder weapon and said, "[T]his is the last thing that Robert Cole felt [sic]," and then pulled the trigger. Ms. Whiting said that two female jurors gasped in response to the prosecutor's demonstration.

Petitioner testified in his own behalf. He conceded that he testified at trial that he was "clear headed" during the shootings. Petitioner said, however, that he meant that he was not angry when the shootings occurred, not that he was not under the influence of drugs. Petitioner contended that his trial counsel should have clarified Petitioner's understanding of the word "clear headed" on redirect examination. Petitioner also contended that trial counsel should have presented expert testimony about the effect the drugs and alcohol he had consumed that night would have had on his conduct. Petitioner said that the prosecutor put the murder weapon to the back of her head during closing argument to demonstrate how Mr. Cole was shot, and then pointed the gun at the jury.

At the conclusion of the post-conviction hearing, the trial court found that Petitioner had not shown that his counsel provided ineffective assistance or that his deficiencies, if any, were prejudicial, and dismissed Petitioner's petition for post-conviction relief.

## III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). The trial court's findings of fact in a post-conviction hearing are afforded the weight of a jury verdict. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Therefore, this Court may not re-weigh or re-evaluate these findings nor substitute its inferences for those of the trial judge unless the evidence in the record preponderates against those findings. *State v. Honeycutt*, 54 S.W.3d 762, 763 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). In addition, questions concerning the credibility of witnesses and the weight and value given their testimony is resolved by the trial court, and not this Court. *Burns*, 6 S.W.3d at 461. However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to de novo review. *Id.*; *Burns*, 6 S.W.3d at 461.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997).

That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

## IV. Prosecutorial Misconduct

Petitioner argues that the prosecutor engaged in prosecutorial misconduct during closing argument by misrepresenting the dialog between the 911 caller and the 911 operator, and by pulling the trigger of the murder weapon while the gun was aimed at the jury. The State argues that Petitioner has waived his issue of prosecutorial misconduct for failure to raise it on direct appeal. Tennessee Code Annotated section 40-30-106(g) provides that:

> [a] ground for relief is waived if the petitioner personally or though an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Petitioner's claims that the prosecutor misrepresented evidence or engaged in improper demonstrations during closing argument could have been raised on direct appeal, and this claim for relief is not "based upon a constitutional right not recognized as existing at the time of trial." *Id.* § 40-30-106(g). In his petition, Petitioner stated that the issue of prosecutorial misconduct was not raised on direct appeal due to the ineffectiveness of his trial and appellate counsel. No evidence, however, was presented at the post-conviction hearing in regard to that claim.

When a petitioner fails "to raise [an] . . . issue on direct appeal, he effectively block[s] any consideration of this issue by this Court on post-conviction review" under Tennessee Code Annotated section 40-30-112(b), and Tennessee Code Annotated sections 40-30-111 and -112(a) and (b) "effectively prevent the application of Rule 52(b)" in the post-conviction forum. *State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000); *Brimmer v. State*, 29 S.W.3d 497, 530 (Tenn. Crim. App. 1998) (Petitioner's issue on prosecutorial misconduct "waived for failure to present [it] on direct appeal"). Accordingly, we conclude that the issue is waived in this post-conviction proceeding pursuant to Tennessee Code Annotated section 40-30-106(g). Petitioner is not entitled to relief on this issue.

Nonetheless, were we to review Petitioner's issue on the merits, he would not prevail. Neither the trial court nor Petitioner's trial counsel saw the assistant district attorney aim the murder weapon at the jury. The trial court concluded that it was not convinced that the incident occurred in the manner described by Mr. and Mrs. Whiting during their testimony. Petitioner did not offer any testimony by a member of the jury that the incident occurred. The trial court was in the best position to judge the credibility of the witnesses, and the evidence does not preponderate against the trial court's findings that Petitioner failed to establish that the assistant district attorney engaged in prosecutorial misconduct by aiming the murder weapon at the jury during closing argument.

## V. Ineffective Assistance of Counsel

### A. Failure to Object to Closing Argument

Petitioner argues that his counsel's performance was deficient when he failed to object to the prosecutor's misrepresentation of the substance of the 911 tape during closing argument. Petitioner contends that the following portion of the State's closing argument to the jury was misleading:

> You were able to hear on the 911 tape how long a period of time it was from when the vehicle first left with [Petitioner] in it to the time it returned. It was at least mid-way through that call before the car returned. And you know, from description of the eye-witnesses that it was on that return to the apartment, after having a chance to go away with at least Mr. Cole being alive, he choose [sic] to go back in the apartment and fire more shots.

> These are the shots, ladies and gentlemen, that we would contend were to Mr. Cole's head. One being on the front, left side of his face exiting out the right, and one from the backside of the – the right side of the head exiting out the left. A perfect crisscross of his brain. He intended to kill Robert Cole when he fired those two shots through his head. There was no reason to do it, except that he intended to do it, and he had plenty of time to think about it before he did.

Petitioner contends that the State erroneously told the jury that the 911 tape supported its theory that Petitioner fired another round of gunshots after he returned. We do not read the State's comments in that light. The State relied on the caller's comments to the 911 operator to establish that Petitioner started to drive away from the crime scene, and then returned in a few minutes. The State then argued that two witnesses testified that they heard a series of gunshots after Petitioner returned to the apartment. Petitioner testified that he did not fire his weapon the second time he was in the apartment. As the trial court observed, this is a matter of the witnesses' credibility which was properly left to the jury. The evidence does not preponderate against the trial court's findings that Petitioner failed to show that his trial counsel was ineffective for failing to lodge an objection during the presentation of the State's closing argument. Petitioner is not entitled to relief on this issue.

### B. Objection to Jury Listening to 911 Tape during Deliberations

Petitioner argues that his trial counsel's performance was also deficient when he objected to the jury's request to review the recording of the neighbor's conversation with the 911 operator during deliberations. Trial counsel said that, in retrospect, if he had reviewed the tape before voicing his objection to the jury's request, he would have responded differently. Trial counsel also said, however, that it was necessary to make the decision quickly, and there was no way he could assess why the jury made the request or whether the inability to review the 911 tape had any impact on the jury's deliberations.

The trial court found that trial counsel's decision was one of tactical strategy, and declined to second-guess the appropriateness of his decision in hindsight. *See Henley*, 960 S.W.2d at 579. The trial court found that Petitioner had failed to show that his counsel was ineffective in this regard. The trial court also found that Petitioner had not shown that he was prejudiced by his trial counsel's decision to object to the jury's request. The 911 tape was played to the jury during trial. The trial court also noted that "[w]ithout testimony from one of the jurors, it is pure speculation to contend that they wanted to hear the tape to make sure that it showed that only one set of shots were fired."

In assessing trial counsel's performance at trial, "it is not [the reviewing court's] function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" *Id*. (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). A particular decision does not render trial counsel's conduct deficient if the decision was "within the range of competence demanded of attorneys in criminal cases." *Baxter*, 523 S.W.2d at 936. Based upon our review of the record, we find that the evidence does not preponderate against the trial court's finding that trial counsel's decision concerning the request posed by the jury during deliberations was within the range of competence demanded of attorneys in criminal cases. Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a review of the record, we affirm the judgement of the trial court.

_____
THOMAS T. WOODALL, JUDGE