**Hugh Peter BONDURANT and Kenneth Patterson Bondurant**

v.

**STATE of Tennessee.**

Court of Criminal Appeals of Tennessee, at Nashville.

Dec. 20, 2005 Session.

Feb. 17, 2006.

Application for Permission to Appeal Denied by Supreme Court Aug. 21, 2006.

Herschell Koger, Pulaski, Tennessee, for the appellant, Kenneth Patterson Bondurant.

Stanley Pierchoski, Lawrenceburg, Tennessee, for the appellant, Hugh Peter Bondurant.

Michael E. Moore, Solicitor General; Elizabeth B. Marney, Senior Counsel; Mike Bottoms, District Attorney General; and Patrick Butler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

This is an appeal from the dismissal of post-conviction petitions due to a finding of unfavorable DNA analysis results. The Petitioners, Hugh Peter Bondurant and Kenneth Patterson Bondurant, challenge the trial court's dismissal of their petitions for DNA testing and analysis filed pursuant to the Post–Conviction DNA Analysis Act of 2001. After ordering DNA testing, the trial court found the results of the DNA analysis were not favorable to the Petitioners and dismissed both of their petitions for post-conviction relief. *See* Tenn.Code Ann. § 40–30–312. The Petitioners now appeal to this Court, alleging that their DNA analysis is incomplete and therefore they are now entitled to additional serological testing. We affirm the judgments of the trial court.

## FACTS

In 1991, a Giles County jury found both Petitioners guilty of second degree murder and the trial court sentenced them to twenty-five years imprisonment. Their convictions were affirmed by this Court in May of 1996. *See State v. Kenneth Patterson Bondurant*, No. 01C01–9501–CC–00023, 1996 WL 275021 (Tenn.Crim.App., Nashville, May 24, 1996). A comprehensive summary of the facts underlying the convictions may be found in that opinion. *See id.* at *1–*14. However, for the purposes of this appeal it is sufficient to note that an eye-witness testified at trial that the victim was beaten so severely with a stick or axe handle that blood spattered on the ceiling and walls of the room in which she was murdered. Additionally, forensic investigators took samples of the stains found on a wall in that room and testified that the stains were human blood. *See id.* at *7.

The Petitioners' first petitions for post-conviction relief were dismissed as time-barred, a ruling upheld by this Court in October of 2002. *See Kenneth P. Bondurant, and Hugh Peter Bondurant v. State*, No. M2000–02287–CCA–R3–PC, 2002 WL 31487529 (Tenn.Crim.App., Nashville, Oct. 30, 2002). In February of 2002, several months before the first post-conviction petition denials were affirmed by this Court, Petitioner Hugh Bondurant filed a pro se "Petition for relief from conviction or sentence pursuant to Tennessee Code Anno-

tated 40–30–301 through 40–30–312."[1] The trial court, treating the ambiguously titled petition as merely a second petition for post-conviction relief, summarily dismissed the petition without an evidentiary hearing in March of 2002.[2] *See Hugh Peter Bondurant v. State*, No. M2002–00863–CCA–R3–PC, 2003 WL 1883086, at *1 (Tenn.Crim.App., Nashville, April 16, 2003). However, this Court reversed the trial court's ruling in April of 2003, noting that the Petitioner had actually "sought relief under the Post–Conviction DNA Analysis Act." *Id.* at *1. The case was remanded to the trial court for further findings of whether DNA testing was warranted in the Petitioner's case. *Id.* at *3.

In February of 2004, the trial court issued an order mandating that DNA testing and analysis be conducted in both of the Petitioners' cases. Pursuant to an agreed order, DNA testing and analysis was conducted on evidence assumed to contain blood stains, and in November of 2004, a joint evidentiary hearing was conducted in which the results of the DNA analysis was presented to the trial court.

At this hearing, Mr. William Watson, the laboratory director of the forensic division of the private scientific testing company Cellmark, was certified as an expert in the field of DNA testing. Mr. Watson testified that he received several samples of wallpaper that contained "stains." These samples were presented to him as "bloodstains," and he was requested to "perform DNA analysis on them" in order to determine if human DNA was present and the gender of the person who contributed the DNA. Mr. Watson testified that he ran a series of DNA tests in which the polymerase chain reaction (PCR) process was used to replicate any DNA found in the genetic sample, and fourteen separate loci or locations on the DNA were analyzed in order to produce a profile. However, in this case, Mr. Watson testified that he was "unable to generate a DNA profile from the samples that were submitted" because "no DNA was detectable."

Mr. Watson further testified that the results of the DNA analysis done on the samples he was presented with suggested three possible conclusions: 1) the stains were blood, but not human blood; 2) the stains were "human blood [but] the sample has degraded to the point where [the DNA scientists] are no longer able to get a DNA profile"; or 3) the stains were not blood at all. Mr. Watson added that other serological tests exist—though they are not DNA tests-that may be able to better establish whether the stains on the samples are human blood or not. Mr. Watson explained that these tests "are not DNA-type tests, but they are commonly done in DNA testing laboratories." He further explained that his lab did not conduct these additional serological tests when it was tasked with developing a DNA profile because it was his "understanding at the time that it was blood, so we didn't do the [additional serology] test." Mr. Watson also testified that a Luminol test, the type of test reportedly done at the crime scene by the Tennessee Bureau of Investigation (TBI), is not conclusive for determining if a suspect substance truly is human blood because this particular test reacts to many things other than blood.

---

1. The record reveals that Petitioner Kenneth Patterson Bondurant filed a nearly identical petition several months earlier in November of 2001. Each petitioner appealed from the order denying relief. This Court ordered the appeals to be consolidated.

2. The Post–Conviction Procedure Act contemplates the filing of only one petition for post-conviction relief and mandates that subsequent petitions be summarily dismissed. *See* Tenn.Code Ann. § 40–30–102(c).

On cross-examination, Mr. Watson testified that the "primary factor that impacts our ability to get a profile is the condition of the DNA." He added that DNA condition is affected by factors such as weather, sunlight, humidity, time, and the presence of an inhibitor.[3]

Ms. Margaret Bash, a forensic scientist with the TBI who specializes in serology and DNA analysis, was certified by the trial court as an expert in the field of serology. Ms. Bash stated that she initially investigated the crime scene in this case and, using the Luminol test, determined the possibility of the presence of blood. She cut samples from the wallpaper and took them to her laboratory for further analysis. At her lab, she ran three additional tests: a tetamethylbenzidene test, a phenylthalene test, and an antigen test. Ms. Bash testified that considering the positive results of all four tests, she determined that the stains found on the walls at the crime scene were human blood stains.

On cross-examination, Ms. Bash admitted that her original 1990 report listed only her conclusion that the substance was human blood and did not list details about the various tests run, but she explained that she kept working notes that did reference the various tests she conducted and their individual results. She was questioned about the possibility of false positives from the three chemical tests as well as the antigen test, the latter of which she conceded reacts to most bodily fluids and not just blood. Ms. Bash responded: "I don't know of anything else that gives those same positive presumptive tests that is a characteristic reddish-brown color that when those tests are positive and then

followed up with a crossover test, which is also positive, would be anything other than human blood." When asked if it was still her professional opinion that the substance she analyzed from the crime scene samples was human blood, Ms. Bash responded in the affirmative.

Mr. Watson was again called to the stand and testified that in 1990, when the TBI processed the crime scene, a serological test for the presence of hemoglobin was available and would have been the preferred test to determine if the substance collected from the walls was indeed human blood. He further stated that the wallpaper sample collected from near the light switch was suspect because a "sufficient amount of sweat" deposited over the years could give a positive reaction in the antigen test used by the TBI. However, on cross-examination, Mr. Watson admitted that no test he described in his testimony would be able to give an absolutely definitive answer to the question of whether the substance on the samples was human blood or not.

At the evidentiary hearing, the Petitioners, through counsel, stated that "the possibility that [the stain tested] was not blood was inadvertently discovered as a result of the DNA testing." Accordingly, the Petitioners argued that further testing was necessary to 1) determine if the stain was blood, and 2) if so, whether it was human blood. The Petitioners asserted that if further testing revealed the stains were not human blood, such evidence would be favorable in that it would "significantly impeach[ ]" the eye-witness testimony presented at trial.

3. The record reveals that the murder took place in 1986, and the DNA analysis was conducted approximately eighteen years later in 2004. Additionally, an eye-witness testified at trial that she attempted to clean the blood off of the walls prior to the collection of the samples, and Mr. Watson testified at the post-conviction hearing that the stains "looked as though they may be something that was brushed on or perhaps had been a stain there and then it had been cleaned up."

In November of 2004, the trial court issued an order denying the Petitioners' petitions for post-conviction relief pursuant to the DNA Analysis Act. The court found that in the agreed order for DNA testing, "all parties agreed to DNA testing and analysis ... of blood for gender and DNA profile." The court further found that this DNA testing was conducted and "no DNA results were obtained from the samples." Furthermore, the Court accredited the testimony of Ms. Bash that the samples tested "contain[ed] blood of human origin." As to the Petitioner's request for additional serological testing, the court found that the Petitioners were "improperly attempting to question, review and test the sufficiency of the evidence at trial in a PCR–DNA setting," and that "the issue of blood of human origin was either addressed, or should have been addresses, at trial or upon direct appeal." The trial court concluded: "No DNA results were obtained from the samples. The results of the Post–Conviction DNA analysis are not favorable to Petitioners; therefore, the Petitions are dismissed pursuant to Tenn.Code Ann. 40–30–412."[4] This appeal followed.

## ANALYSIS

On appeal, the Petitioners argue that the trial court erred in ruling that they "failed to carry their burden of proof at the post-conviction hearing with respect to their entitlement to further DNA testing and analysis." We conclude that the Petitioners are requesting additional testing that is not authorized under the Post–Conviction DNA Analysis Act, and therefore the trial court did not err in finding that further testing was unwarranted. Nor did the trial court err in finding that the results of the post-conviction DNA analysis were unfavorable to the Petitioners and therefore their petitions warranted dismissal.

 Upon review of a post-conviction proceeding, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *See Momon v. State,* 18 S.W.3d 152, 156 (Tenn.1999); *Henley v. State,* 960 S.W.2d 572, 578–79 (Tenn.1997). The trial judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. *See Momon,* 18 S.W.3d at 156; *Henley,* 960 S.W.2d at 578. However, a post-conviction court's conclusions of law of are reviewed under a de novo standard with no presumption of correctness. *See Serrano v. State,* 133 S.W.3d 599, 603 (Tenn.2004).

The Post–Conviction DNA Analysis Act of 2001 ("the DNA Act") provides for post-conviction DNA analysis for petitioners convicted of certain crimes, including second degree murder, in which biological evidence may exist. *See* Tenn.Code Ann. § 40–30–303.[5] *See also Griffin v. State,*

---

**4.** Tennessee Code Annotated section 40–30–412 was transferred to section 40–30–312 in 2003. This section states: "If the results of the post-conviction DNA analysis are not favorable to the petitioner, the court shall dismiss the petition, and make such further orders as may be appropriate."

**5.** We note that in 2001 and 2002, when the Petitioners' filed their initial petitions, the DNA Act was codified in Tennessee Code Annotated sections 40–30–401 et seq. However, in 2003, the Act was moved to Tennessee Code Annotated sections 40–30–301 et seq. For purposes of clarity, this opinion will reference the DNA Act statutes as they are currently codified in sections 40–30–301 and following.

182 S.W.3d 795, 797 (Tenn., 2006). The DNA Act applies to two categories of cases in which DNA analysis might be appropriate. First, DNA testing is required and must be conducted in cases where the trial court finds that:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn.Code Ann. § 40–30–304.

Second, DNA analysis is discretionary and may be ordered if the trial court finds the requirements of parts (2), (3) and (4) above are met, and that: "A reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." Tenn.Code Ann. § 40–30–305(1). Additionally, the DNA Act includes explicit language that allows DNA analysis at "any time," thus superceding any general statute of limitations. Tenn.Code Ann. § 40–30–303.

In this case, the Petitioners, following a favorable ruling from this Court, were afforded DNA testing and analysis pursuant to the DNA Act. However, the DNA analysis revealed that no DNA could be found in the samples submitted. The Petitioners now claim that their DNA analysis is not complete and thus further testing is required. To support this assertion, the Petitioners argue that a correct interpretation of the DNA Act would be that the Act's intent is to make available current technology not available at the time of the trial on a case-by-case basis, and therefore additional serological testing is required in their cases. The State simply argues that the DNA Act, properly interpreted, does not provide for the type of testing requested by the Petitioners, and that the issue of whether the samples tested contain human blood has been previously determined. We find the Petitioner's arguments for an expansive interpretation of the DNA Act unpersuasive.

■ Whether the Petitioners are entitled to additional serological testing pursuant to the DNA Act is essentially a matter of statutory interpretation. We begin by noting that when examining a purely legal issue, such as statutory construction, Tennessee appellate courts adhere to a de novo standard with no presumption of correctness as to the lower court's conclusions of law. *See State v. Owens*, 20 S.W.3d 634, 637 (Tenn.2000); *State v. Alford*, 970 S.W.2d 944, 945 (Tenn.1998) ("Construction of a statute is a question of law which we review *de novo*, with no presumption of correctness.").

The Tennessee Supreme Court has ruled that "[t]he most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). *See also Browder v. Morris*, 975 S.W.2d 308, 311 (Tenn.1998) ("The cardinal rule of statutory construction is to effectuate the legislative intent, with all rules of

construction being aides to that end."). With this in mind, the first step in determining legislative intent is to determine whether the statutory language itself is ambiguous. If it is not, we are limited to the plain meaning of the statutory language.

■■■ We are instructed by our highest court to "initially look to the language of the statute itself in determining the intent of the legislature. Courts are restricted to the natural and ordinary meaning of the language used by the legislature in the statute, unless an ambiguity requires resort elsewhere to ascertain legislative intent." *Browder*, 975 S.W.2d at 311 (citing *Austin v. Memphis Pub. Co.*, 655 S.W.2d 146, 148 (Tenn.1983)). Appellate courts must "assume that the legislature used each word in the statute purposely, and that the use of these words conveys some intent and has a meaning and purpose." *Browder*, 975 S.W.2d at 311 (citing *Locust v. State*, 912 S.W.2d 716, 718 (Tenn.App. 1995)). Thus, "[w]here the words of the statute are clear and plain and fully express the legislature's intent, there is no room to resort to auxiliary rules of construction, and we need only enforce that statute as written." *Browder*, 975 S.W.2d at 311 (citing *Roberson v. University of Tennessee*, 912 S.W.2d 746, 747 (Tenn.App. 1995) and *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn.App.1995)).

In this case, the Petitioners assert that the "bloody wallpaper was the most devastating physical evidence the State introduced," noting that the blood spatterings were described at length by eye-witness Denise Bondurant, were entered as exhibits at trial, and were also incorporated into the prosecution's closing arguments. It is the Petitioners' position that if further testing did reveal that the stains on the wallpaper samples were not human blood, such evidence would "seriously impeach[ ]" the testimony of Denise Bondurant so as to "taint[ ] every bit of her testimony concerning other aspects of the murder and disposal of the body." Accordingly, the Petitioners argue that they met all the requirements necessary to receive DNA testing and analysis. However, they also claim that the "DNA testing by the trial court [is not] finished yet," and now argue that "[a]dditional testing must be performed to give meaning to the instant test results and to accomplish what the statute set out to do."

The Petitioners claim the trial court "erred by reading the [DNA analysis] statute in a vacuum," and urge this Court to interpret the statute broadly and according to the "legislative intent." To this end, the Petitioners argue that the legislature intended for "technology" to be used in addition to specific DNA testing if it would help dispose of an issue.[6] By denying their request for additional serological testing, the Petitioners argue the trial court has "effectively denied [them] substantive application of the DNA PCR statute." The essence of the Petitioners' argument is that the DNA Act should be "reasonably construed to effectuate its intent," which the Petitioners describe as: "to make the technology available and to allow such testing to be substantive on a case-by-case application."

■■■ We conclude that the Petitioners' arguments require a finding of "legislative intent" that cannot fairly and accurately be construed from the language of the Act

6. While not precisely stated, the argument in the Petitioners' appellate brief suggests that the legislative intent of the DNA Act was to provide for DNA analysis as well as any other testing that my be beneficial to a defendant based on new scientific technology or technology not utilized in the original trial.

itself. The DNA Act allows for "forensic DNA analysis" of evidence related to a judgment of conviction. *See* Tenn.Code Ann. § 40–30–303. The Tennessee Legislature has defined "DNA analysis" for the purposes of this Act as "the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes." *Id.* at 40–30–302. The Act, by all accounts, provides for DNA testing and analysis but does not provide for additional scientific testing not encompassed within the clearly defined term "DNA analysis."

In interpreting the statutes that codified the DNA Act, our supreme court has recently declared that

> [C]ourts must attempt to give effect to the legislative purpose and intent of a statute, as determined by the ordinary meaning of its text, rather than seek to alter or amend it. When a statute lacks contradiction or ambiguity, courts are not at liberty to depart from the words of the statute. If the language contained within the four corners of a statute is plain, clear, and unambiguous, the duty of the courts is simple and obvious, to say sic lex scripta, and obey it.

*Griffin,* at 799 (citing *Wausau Ins. Co. v. Dorsett,* 172 S.W.3d 538, 543 (Tenn.2005)). In this case, we find the DNA Act's legislative intent, as determined by the ordinary meaning of its text, is to provide for DNA analysis—and only DNA analysis. While the Tennessee Legislature could enact a law allowing post-conviction testing based upon any new or unused scientific technology, it has not done so. The plain, clear, and unambiguous language of the statutes at issue in this case allow for DNA analysis, but not additional serological testing.

We are also unpersuaded by the Petitioners' argument that, because the "possibility" that the samples tested were not human blood was discovered as a result of the DNA analysis, therefore additional non-DNA serological tests are required to "finish" the initial DNA testing. The Petitioner's own DNA expert testified that the additional tests requested by the Petitioners are "not DNA–Type tests, but they are commonly done in DNA testing laboratories." This may be accurate, but the fact that many DNA laboratories are also adept at a variety of other scientific testing outside the field of DNA analysis does not alter the Tennessee DNA Act's clear mandate for allowing only "forensic DNA analysis." *See* Tenn.Code Ann. 40–30–303. The inconclusive results of the petitioner's DNA analysis suggests that they were not entitled to DNA testing at all. The controlling statutes allows for DNA testing only when the evidence "may contain biological evidence," *see* Tenn.Code Ann. § 40–30–303, and only if "[t]he evidence is still in existence *and in such a condition that DNA analysis may be conducted,*" *see* Tenn.Code Ann. §§ 40–30–304(2) and –305(2) (emphasis added). The DNA analysis that was conducted in this case revealed that the substance in evidence either was not human blood, or if it was, it was "degraded to the point" that no DNA profile could be made. Thus, a plain reading of the DNA Act would not only preclude additional non-DNA testing, but would also suggest that, in the Petitioners' cases, the available evidence likely failed to meet the initial requirements necessary to grant the DNA analysis already done.

Finally, we note that it is unclear what remedy the Petitioners are ultimately attempting to seek through their request for additional scientific testing. The trial court was correct in its assertion that a post-conviction petition is not the place to challenge the sufficiency of evidence.

Moreover, we agree with the State that the matter of whether the stains on the wall paper samples contain human blood was previously determined. Ms. Bash of the TBI testified at the original trial and again at the DNA Act hearing that the samples in question contained human blood. The Petitioner's DNA testing and analysis did not produce results which contradicted Ms. Bash's testimony.

The Petitioners petitioned for and received DNA testing and analysis of the biological evidence related to their murder convictions. The results of this DNA analysis was that "no DNA was detectable." We conclude that the Petitioners are not entitled to any further non-DNA analysis or scientific testing of the samples under the provisions of the DNA Act. In short, the Petitioners received the benefit provided by the DNA Act, and their DNA analysis yielded no useful results at all. Thus, the trial court did not err when it concluded that the DNA analysis results were unfavorable to the Petitioners, dismissed their DNA Analysis Act petitions, and denied post-conviction relief.

## CONCLUSION

Based on the foregoing reasoning and authorities, we find no error. Accordingly, the dismissals of the Petitioners' Post–Conviction DNA Analysis Act petitions are affirmed.