IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 1, 2006

## JOSEPH W. WILSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C04-249     Roger A. Page, Judge**

_____

**No. W2005-00808-CCA-R3-PC  - Filed October 31, 2006**

_____

The Petitioner, Joseph W. Wilson, was convicted of one count of attempted second degree murder, three counts of aggravated rape, especially aggravated robbery, especially aggravated burglary, conspiracy to commit aggravated burglary, and misdemeanor vandalism.  He was sentenced to seventy-one years confinement.  On appeal, this Court affirmed the Petitioner's convictions and sentences.  The Petitioner petitioned for post-conviction relief claiming that he had received the ineffective assistance of counsel.  The post-conviction court dismissed the post-conviction petition as untimely, and we affirm that judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DAVID G. HAYES, J., joined.

Benjamin C. Mayo, Jackson, Tennessee, for the appellant, Joseph W. Wilson

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Jerry Woodall, District Attorney General; Alfred Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I.  Facts**
**A. Facts on Direct Appeal**

As set forth in our Court's opinion on direct appeal, the proof at the Petitioner's trial established the following facts:

During the early morning hours of Saturday, November 27, 1999, the seventy-year-old victim awoke when intruders entered her home.  The victim identified the intruders as the defendant and Jason White.  She stated the defendant instructed her to get out of bed.  She said that when she complied, the defendant

placed a knife to her throat and walked her down the hall into the den, where he asked her for money. She testified that after the intruders took six dollars from her purse, the defendant took her into a bathroom and sat her on the commode.

The victim stated the intruders tied her hands behind her back with a towel. She said the defendant placed his penis in her mouth and threatened to cut her throat if she did not perform fellatio. The victim testified that when she did not perform to the defendant's satisfaction, he then threw her to the floor, removed her clothing, and inserted his penis into her vagina. Her vagina was torn and required stitches.

According to the victim, the defendant then pulled her off the floor and struck her head against a wall. The victim stated the defendant "rant[ed] and rav[ed]," and called her a "whore" and a "bitch." She testified the defendant again placed his penis back into her mouth, threatened to cut her throat if she did not perform fellatio, and kicked her. The victim testified she asked the defendant why he was doing this, and he replied, "Because you didn't have much money."

The victim stated that during the rapes, White kept telling the defendant, "We need to go." She said that when White had a question about the rifles in her gun cabinet, the defendant went out of the bathroom and gave instructions on which guns to take. She said the intruders asked her for her car keys, and she told them they were by the back door.

She testified that before the intruders left, the defendant cut her throat and said, "Now, bitch, I guess you'll call the police." She stated she felt blood gushing but lay still and pretended to be dead. After the intruders left, the victim fled to her daughter's nearby home, where her daughter and son-in-law obtained emergency assistance for her. The victim was transported to the hospital, where doctors performed surgery to repair the huge, gaping laceration to her throat and the laceration in her vagina. Miraculously, the victim survived.

According to the victim, the intruders took the cash from her purse, rifles, diamond rings and other jewelry, and her white 1991 Cadillac Seville. She testified they also broke the lock on her gun cabinet.

The victim stated she only saw two intruders, whom she identified as the defendant and White. She said that at one point, the defendant instructed White to guard the bathroom door while the defendant left the bathroom. She said the defendant also told White to "gather up stuff." She testified both the defendant and White were carrying knives, but that White never entered the bathroom and never touched her.

Jason White testified that on the night of the offense he, the defendant,

2

Brandon Taylor, and Rodney Smith were riding in Taylor's car searching for a house to burglarize. White stated they chose to enter the victim's house because there was no car in the driveway. He said all of them except Taylor, who was driving, exited the car and approached the victim's house. White indicated Taylor was to drive up and down the road and wait on them, but instead left. White testified that he, the defendant, and Smith entered the victim's home after Smith kicked in the front door. White stated that he and Smith exited the house immediately after they heard the victim ask, "Who are you?"

According to White, when he and Smith went outside, Taylor's car was gone. White said he and Smith were standing in front of the house when the victim stepped outside, and the defendant pulled her into the house. White testified he and Smith reentered the house after the defendant told them to come in and "get everything." White said the defendant sat the victim on the commode in the bathroom and told White to stay with her while he found something to bind her. White stated he remained outside the bathroom. White testified the defendant returned with something that appeared to be a white scarf and used it to tie the victim.

White stated he then went into a bedroom, where he took some jewelry and then went into the hall, where he and Smith took several guns. White said he and Smith told the defendant it was time to leave. White testified that while the defendant was in the bathroom, he heard the victim say, "Please don't do this," and "What do you want?" White stated that the defendant cursed the victim and used a loud, mean tone of voice. According to White, the defendant asked him if he "wanted some," apparently inquiring if White wanted to have sex with the victim; White said he refused and indicated they should leave. White testified the defendant said, "Well, I'm going to cut this bitch's throat." White stated he again encouraged the defendant to leave. White said he and Smith went outside, and the defendant exited behind them.

White testified they found a white Cadillac in the garage, and he and the defendant reentered the house to find the keys. White said the defendant walked down the hall, kicked the victim, and yelled, "Bitch, where are your f-king keys at?" White testified the defendant then told him the car keys were by the back door. White stated that after he found the keys, he walked down the hall and saw the victim on the floor with her head tilted back and blood on her throat. According to White, after they exited the house, the defendant told him he cut the phone lines so the victim would not call the police.

White said he, the defendant, and Smith left in the Cadillac. White testified he saw a knife blade in the defendant's hand as they drove off; he described the blade as "squiggly" and "then straight at the end." White admitted he also had a knife, but stated he did not use it on the victim. White said they then met Taylor, who

3

accompanied them to an unoccupied house where the defendant used the knife to cut a window screen.  White testified that they entered the house through the window, took money, and left.

Brandon Taylor testified that he was in his car with the defendant, White, and Rodney Smith when they chose the victim's house as a target for a burglary.  Taylor stated he pulled into the driveway, the others exited the car, and he left.

Rodney Smith testified Taylor drove him, the defendant, and White to the victim's home where all of them except Taylor exited the vehicle with the intent of breaking into the house and stealing property.  According to Smith, they planned for Taylor to drive up and down the road and wait for them to return to the car.  Smith stated he saw the defendant carrying a knife as they approached the house.  Smith stated he, the defendant, and White entered the house.  Smith said he broke into a gun case and was gathering rifles when he heard the victim ask, "Who's there?"  Smith testified he then ran out of the house and into the front yard while carrying the rifles.

Smith stated he was crouched down near bushes in front of the house when the victim walked out of a door, and then someone escorted her back inside.  Smith testified he briefly reentered the house; told the defendant and White, "Come on, let's go;" and exited. Smith said White promptly joined him and, while they were waiting on the defendant, they found the victim's white Cadillac in a garage behind the house.  Smith testified he and White told the defendant to ask the victim for her car keys, and a few seconds later, the defendant instructed them the keys were by the back door.  Smith stated that while he was in the house, he heard the defendant say to the victim, "Where's the f-king money at, bitch, or I'll kill you."  Smith testified he heard the victim ask, "Why are you doing this?" while she was in the bathroom.  Smith stated he did not enter the bathroom.  He said that he and White returned to the victim's car with the keys and waited for the defendant.

Smith said he, the defendant, and White left in the Cadillac.  Then they picked up Taylor at his grandmother's home, and the four of them went to another house where the defendant used a knife to cut a window screen, which allowed them to enter the house.

Albert Jackson testified his home was burglarized on November 27, 1999, while he was at work; when he returned home, he noticed a window screen was cut and a window was broken.  Deputy David Ward of the Madison County Sheriff's Department found a knife on the ground under the broken window.  Ward stated the knife blade was stained with blood.  He described the blade as having "indentations" and being "serrated."

Margaret Bash, a forensic scientist with the TBI crime lab, testified that DNA

testing showed the blood on the knife belonged to the victim. Bash further testified that no blood was found on the defendant's coat, and tests failed to reveal the presence of semen on vaginal and oral swabs taken from the victim.

The defendant, who was sixteen at the time of the offense, testified he was not at the victim's home and did not commit the offenses. He described in detail his activities of the day and night. According to the defendant, he spent the evening with Ande Braddock, Lee Coley, Patricia Coley, Guy Goodman, and Danny Wilson at Wilson's house, where they all remained until the following morning.

Lt. Donna Turner testified the defendant told her he was in a car with Ande Braddock, David Price, and a man named Chuck at the time of the offense. She also stated the defendant laughed when she showed him a photograph of the victim's injuries. The defendant testified that when he gave the statement to Lt. Turner, he was mistaken about the date when he was in a car with Ande Braddock and David Price. He also denied laughing when Lt. Turner showed him a photograph of the victim.

Ande Braddock testified the defendant was with him from November 25 through November 28, 1999. According to Braddock, he and the defendant picked up Lee Coley and went to Danny Wilson's house where he and the defendant spent the night with Wilson, Lee Coley, Patricia Coley, and Guy Goodman, and they fell asleep watching movies sometime between midnight and 5:00 a.m. Braddock stated that Guy Goodman awoke them the following morning.

Vicki Braddock, Ande Braddock's mother, testified the defendant was with her son during the Thanksgiving weekend. She stated that on Friday, November 26, 1999, shortly before dusk, Ande Braddock and the defendant were at her home when they left to give a neighbor a ride home. She stated they returned a short time later. She said she also saw the defendant with her son the following afternoon. Robert Eguires testified he saw the defendant and Ande Braddock at a bar sometime between 5 p.m. and 7 p.m. on Friday, November 26th. The defendant also presented the testimony of Lee Coley, Danny Wilson, Patricia Coley, and Guy Goodman corroborating that the defendant and Ande Braddock were with them at Danny Wilson's home at the time the offenses were committed. David Price testified he, Ande Braddock, and the defendant rode together in a car on Thanksgiving night.

April Kennon testified that in the early morning hours of Saturday, November 27, 1999, Jason White came to the hotel room she shared with her then boyfriend and current husband, Chris Kennon. She stated White arrived with some other individuals in a white Cadillac. She testified White had a knife with blood on it, that he said he cut a lady's throat twice because she did not have much money, and he thought the lady was dead. She stated White gave her some jewelry. She

5

acknowledged that she had given a prior statement to law enforcement in which she said the defendant was in the white Cadillac.

The defendant also presented proof that none of the fingerprints lifted from the victim's gun cabinet or car matched the defendant's fingerprints, and that tests failed to reveal any fiber transfers between the defendant's and the victim's clothing or other items.

The jury found the defendant guilty of attempt to commit second degree murder, a lesser-included offense of attempt to commit first degree murder; three counts of aggravated rape; especially aggravated robbery; especially aggravated burglary; conspiracy to commit aggravated burglary; and misdemeanor vandalism. The trial court sentenced the defendant to an effective sentence of seventy-one years.

State v. Joseph W. Wilson, No. W2001-03007-CCA-R3-CD, 2003 WL 261939, at *1-5 (Tenn. Crim. App., at Jackson, Feb. 3 2003) (footnote omitted), *perm. app. denied* (Tenn. May 27, 2003). In that opinion on direct appeal, this Court affirmed the Petitioner's convictions and sentences.

## B. Post-Conviction Facts

At issue in this case is whether the Petitioner's petition for post-conviction relief was timely filed. The Petitioner filed a petition for post-conviction relief on June 3, 2004, and it was stamped as filed on June 7, 2004. The Petitioner was appointed counsel on June 10, 2004.

In the post-conviction petition, the Petitioner asserted that the Supreme Court of Tennessee denied his application for permission to appeal on June 10, 2003, as opposed to May 27, 2003.[1] Additionally, the Petitioner claims that he was denied the effective assistance of counsel at his trial. At a hearing on the Petitioner's claims, the following evidence was presented: the Petitioner testified that he received the mandate denying his application to appeal from the Supreme Court dated June 10, 2003. He interpreted that mandate to indicate that his statute of limitations was to run from that date, as opposed to May 27, 2003, the actual date of application denial.

There were numerous claims below, but in the testimony related to this appeal, the Petitioner claimed that he was denied the effective assistance of counsel because his trial attorney ("Counsel") declined to call to the stand Kennon and Lyons, both of whom were potential alibi witnesses. The Petitioner claimed that both men would have testified that they heard one of the other members of the group, White, state that he and the two other members of the group were essentially framing the Petitioner to get lighter sentences and that the Petitioner was not present during the crimes.

Counsel also testified at the hearing. He stated that he interviewed Kennon and made the

---

[1]We take judicial notice that the Court of Criminal Appeals' mandate was issued on June 10, 2003. The Petitioner's attorney acknowledged that records showed that the permission to appeal was denied on May 27, 2003.

strategic decision not to call Kennon because Kennon was uncooperative. Also, Kennon claimed that if he was called to the stand he would "take the fifth" or claim he knew nothing about the situation. After Counsel's interview with Lyons, Counsel determined that Lyons had no information that would be helpful to the Petitioner and, therefore, decided that there was no need to call Lyons to the stand.

## II. Analysis

On appeal, the Petitioner claims that the trial court erred when it dismissed his petition for post-conviction relief. The Petitioner claims he was denied the effective assistance of counsel. He asserts that counsel was ineffective by not calling two witnesses to the stand. The State counters that the Petitioner's petition is time barred and, even if not barred, it is without merit.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

Pursuant to the Post-Conviction Procedure Act of 1995, one must file a claim for post-conviction relief "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken . . . or consideration of such petition shall be barred." Tenn. Code Ann. § 40-30-102(a) (2003). There are certain exceptions to this one year statute of limitations, including claims raised under Tenn. Code Ann. § 40-30-102(b) or (c), or if the Petitioner's due process rights would be violated. See Williams v. State, 44 S.W.3d 464, 468 (Tenn. 2001) (noting due process rights were in issue because of potential attorney misrepresentation) (citing Seals v. State, 23 S.W.3d 272, 279 (Tenn. 2000)). Here, we have no concerns that the Petitioner's due process rights have been violated, and the Petitioner has not claimed such. See Sidney McGlowan v. State, No. W2000-01925-CCA-R3-PC, 2001 WL 1584130, at *2 (Tenn. Crim. App., at Jackson, Nov. 29, 2001) (discussing application of due process requirements), *no Tenn. R. App. P. 11 application filed*. Additionally, there are no facts which support an exception under Tenn. Code Ann. § 40-30-102(b) or (c).

In the case under submission, the post-conviction court found, according to the Petitioner's

own testimony, that the petition was filed on June 3, 2004, the day the Petitioner delivered his petition to the prison officials. The court held the petition was time barred because of the untimely filing. Additionally, the court found the Petitioner's ineffective assistance of counsel claims to be meritless because Counsel investigated the case and made the professional and reasonable decision to call or not call the witnesses.

We agree with the State that the post-conviction court correctly determined that the Petitioner's case was time barred. The Tennessee Supreme Court denied the Petitioner's application for permission to appeal on May 27, 2003. The Petitioner received notice of the denial of the application on June 10, 2003. This Court has stated that the statute of limitations period begins to run from the date of the final action not the date the Petitioner was notified of the action. Tracy Lamar Belle, Sr. v. State, No. E2000-02787-CCA-R3-PC, 2001 WL 823410, at *3 (Tenn. Crim. App., at Knoxville, July 23, 2001) (finding a two-year delay in notification does not toll the statute of limitations), *no Tenn. R. App. P. 11 application filed*. Thus, the statute of limitations in this case began to run on May 28, 2003, and extinguished the claim on May 28, 2004. "Failure to include sufficient factual allegations of either compliance with the statute or incompetence requiring tolling will result in dismissal." McGlowan, 2001 WL 1584130, at *2. The Petitioner admits that he mailed the petition on June 3, 2004. Because the claim was filed after May 28, 2004, it was untimely.[2] The post-conviction court properly dismissed the petition.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

---

[2]Additionally, we have reviewed the record and conclude the Petitioner's claim on the merits is meritless. The Petitioner asserts his attorney should have called two witnesses he claims would serve as alibi witnesses. Counsel was reasonable in that he interviewed both of these witnesses and determined they would be of no assistance to the Petitioner. We are also unable to find prejudice because the Petitioner made no offer of proof at the hearing to support his contentions. We may not speculate as to what these witnesses would have testified.