IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 1, 2006

## LARRY DICKERSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Crockett County**
**No. 3006    Jerry Scott, Senior Judge, Sitting by Designation**

------

**No. W2006-00223-CCA-R3-PC  - Filed November 15, 2006**

------

The petitioner, Larry Dickerson, filed a petition for post-conviction relief from his conviction for first degree murder and resulting life sentence. The trial court dismissed his petition. On appeal, the petitioner argues that he received the ineffective assistance of counsel at trial. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Larry E. Copeland, Jr., Memphis, Tennessee, for the appellant, Larry Dickerson.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; C. Phillip Bivens, District Attorney General, pro tem, for the appellee, State of Tennessee.

### OPINION

The facts underlying the petitioner's conviction were summarized by this court in the direct appeal in affirming the conviction:

> The defendant and the victim were married for 27 years and worked in the same factory. In August 1997, the victim moved out of their home and eventually filed for divorce. Witnesses familiar with the defendant testified the defendant's behavior changed dramatically after the separation. The defendant stalked the victim from the time of their separation until the victim's death. He interfered with her work by frequenting her work area. When he was barred from her work area, the defendant began hiding in the ventilation system of the plant where he could watch her through a vent. Outside of work, the defendant repeatedly followed the victim.

He borrowed a friend's truck in order to spy on her. On one occasion, he hid in her vehicle while carrying a pellet pistol in order to frighten her. The defendant wrote numerous letters and notes to the victim during their separation.

In October 1997, the defendant purchased the rifle he used to kill the victim, which was the first firearm he had ever purchased. Just a few hours prior to the killing, the defendant telephoned his son-in-law and asked where he could purchase ammunition for the rifle.

Larry Dean Dickerson, the defendant, shot and killed his estranged wife during the early morning hours of December 20, 1997. Ellen Nunnery, a friend of the victim, testified she had given the victim a ride home. After the victim exited the vehicle, she stooped to speak to Nunnery through the window of the vehicle. Nunnery heard a shot, and the window shattered. A second shot rang out, and the victim collapsed beside the car. The medical examiner testified the victim had been shot twice, once on the left forearm and again in the chest, with the cause of death being the wound to the chest.

The defendant admitted to law enforcement that he shot the victim. He said he parked his car, took his rifle, and walked approximately 200 yards to a hiding place in the bushes across the street from the victim's home. For an hour, he waited in the bushes for the victim to return home. He admitted firing two shots. After shooting the victim, the defendant disposed of the weapon and traveled to several different locations, including Jackson, Memphis, Missouri, and Illinois before returning to his home, where he was arrested several days after the killing.

The prosecution and the defense each presented expert testimony regarding the defendant's capacity to commit a premeditated murder. Dr. Nat Winston, a psychiatrist, testified on behalf of the state that, in his opinion, the defendant had the ability to premeditate the killing. The defendant's expert witness, psychologist Dr. John McCoy, stated the defendant suffered from obsessive compulsive disorder at the time of the offense. He opined the defendant was not capable of premeditation due to the disorder.

The jury convicted the defendant of premeditated first degree murder, and he received a life sentence with the possibility of parole.

State v. Larry Dean Dickerson, No. W2000-02201-CCA-R3-CD, Crockett County, slip op. at 1-2 (Tenn. Crim. App. Sep. 10, 2001), app. denied (Tenn. Sept. 10, 2001).

The petitioner filed a request for post-conviction relief on September 27, 2002. The court appointed counsel, a petition was filed on January 12, 2005, and an amended petition was filed later. At the post-conviction hearing, the petitioner testified that he signed an attorney-client fee contract with his trial counsel that included a provision for a thirty-day notice before the attorney removed himself from the case and a provision for counsel to represent the petitioner up to the appeals level at the state supreme court. The petitioner said counsel did not tell him about pre-trial court dates or about any of the investigation being done for his case. He said that counsel did not discuss the state's evidence with him and that he did not see some crucial pieces of the state's evidence, such as a Tennessee Bureau of Investigation (TBI) report and some photographs, until the trial. He said that trial counsel never communicated a plea offer to him and that counsel told him, "They don't want nothing. We're going all the way."

The petitioner testified that counsel discussed with him his obsessive-compulsive disorder and Dr. McCoy's evaluation of him and testimony. He said counsel rested the entire case on the petitioner's obsessive-compulsive disorder and discussed no other possible defense or strategy with him. He said that at the time of the killing he was taking two medications, Zoloft and codeine. The petitioner felt that counsel should have considered the effects of the medications and their interaction in his defense. He also said a gap of fifteen or sixteen minutes was in his taped interview with TBI Agent David Jolley that was played at trial. He said that during this edited period, he discussed the medications that he took. He said that he informed counsel about this but that counsel did not raise the issue at trial. The petitioner also felt that counsel should have subpoenaed some people from Baptist Hospital, where he received psychological treatment, in order to show the stress he was under leading to the homicide.

On cross-examination, the petitioner testified that the only person hired by his trial counsel with whom he spoke was Dr. McCoy, but he later acknowledged that he had a meeting lasting approximately thirty minutes with a psychiatrist, Dr. William Daniels. The petitioner also acknowledged that he discussed with counsel ten specific witnesses whom he wanted counsel to interview. He said, though, that he never heard anything else from counsel about some of those witnesses and that he was only told that others would not testify. He said he talked to counsel about his stay at Baptist Hospital and that he looked at some of the records counsel had obtained from there. He said that he wrote to counsel numerous times while in jail and that counsel had responded a "couple of times." The petitioner said he had given a confession to Agent Jolley and acknowledged that his counsel filed an unsuccessful motion to suppress the confession. He also acknowledged that he had no alibi defense and that the defense strategy was to prove that he did not have the mental capacity to form the premeditation required for first degree murder.

The petitioner's trial counsel testified that he withdrew from the petitioner's case around the same time that he filed the notice to appeal. Counsel testified that he remembered filing two motions to suppress in the petitioner's case, although the record showed that he had filed three. He said he

remembered talking to the petitioner about potential witnesses, and his file included four pages of hand-written notes summarizing interviews that either he or his paralegal had with ten different witnesses. He said he did not remember conversations about specific witnesses other than Dr. McCoy and Dr. Daniels. He said he discussed with the petitioner two of the state's witnesses, Agent Jolley and Dr. Nat Winston.

Counsel read a letter written by Dr. Daniels, which stated that, in his opinion, if the petitioner had received appropriate treatment, the homicide probably could have been avoided. Counsel acknowledged that Dr. Daniels, who was not called to testify at trial, was a psychiatrist, whereas Dr. McCoy, who did testify for the petitioner at trial, was a psychologist. Dr. Winston, the state's expert witness at trial, was a psychiatrist with several years' experience. Counsel testified that his trial strategy was to prove that the petitioner was not capable of forming premeditation for first degree murder. He said that while Dr. Daniels agreed with Dr. McCoy's evaluation "[t]o a certain extent," Dr. Daniels would have testified that the petitioner "may or may not have had the ability to form premeditation." Counsel acknowledged that he did not attempt to find another psychiatrist who would have testified favorably for the petitioner. He said he did talk to Dr. Daniels and Dr. McCoy about the effects of the petitioner's obsessive-compulsive disorder on his confession and whether they could help in having the confession suppressed. He said neither doctor could assist with that issue.

Counsel testified that although he could not remember specific interviews with the state's witnesses, he knew that he had pretrial discussions with every witness who testified at trial. He said he did not object to Dr. Winston being declared an expert based on not having any publications because he did not believe that alone warranted an objection. He said he did not question Dr. Winston extensively on the methods used to evaluate the petitioner because he thought it would be foolish to do so. He said his strategy was to attack Dr. Winston's ultimate conclusion that the petitioner could have formed premeditation by pointing out that the psychiatrist had not used the legal definition of premeditation in forming his conclusion.

On cross-examination, counsel testified that he began practicing law in 1983 and that he was involved in about 100 criminal jury trials and about a dozen first degree murder trials. He said that he had the petitioner sign a contract that said he would only represent the petitioner at the trial level. He said that when he was first retained, he talked with the petitioner about the petitioner's version of what happened and the facts surrounding the homicide and the petitioner's confession. Counsel said he got the impression that the petitioner's wife's leaving him in the same weekend that his daughter got married and moved away had a dramatic effect on the petitioner. He said he interviewed several people who confirmed this theory. He said the purposes of the psychological evaluations were to determine whether the petitioner was competent to stand trial, whether an insanity defense could be supported, whether the petitioner could have formed the requisite premeditation for first degree murder, and whether the petitioner could have had a "knowing" mental state for second degree murder. He said both Dr. Daniels and Dr. McCoy opined that the petitioner was competent to stand trial and was not legally insane at the time of the killing. Counsel's strategy was then to negate the premeditation element of first degree murder and have the petitioner

convicted of a lesser offense. He said that he discussed this strategy and the potential sentences for different offenses with the petitioner and that the petitioner appeared to understand.

Counsel testified that he did discuss a plea offer with the petitioner and the petitioner's brother. He said both rejected the forty-year offer for second degree murder because they felt that a forty-year sentence, to be served at 100%, would amount to the petitioner spending the rest of his life in prison. He said he conveyed the plea offer to the petitioner the last time he spoke to him before trial, which was one or two days before trial.

The trial court dismissed the petition for post-conviction relief, finding:

> There was no proof presented at the post conviction relief hearing as to anything more that defense counsel could have done to convince a jury that the Petitioner's confession was untrue or that his mental state was such that he could not premeditate and deliberate. It was just impossible to save the Petitioner from a verdict of guilty of murder in the first degree. The advice given and the services rendered by [defense counsel] were clearly within the range of competence demanded of attorneys in criminal cases in Tennessee or elsewhere.

The petitioner appeals the trial court's dismissal of his petition and argues that he received the ineffective assistance of counsel.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697, 104 S. Ct. at 2069.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201.

The petitioner argues that his trial counsel was ineffective by failing to: (1) advise the petitioner of his court dates, visit him regularly in jail, or convey the state's offer to him; (2) discuss the investigation of the case and witness interviews with him; (3) discuss trial strategy, other than attempting to negate intent, and reviewing discovery with him; (4) pursue his use of Zoloft and codeine as a possible defense; (5) raise at trial the issue of the taped conversation between him and Agent Jolley; and (6) call Dr. Daniels, a psychiatrist, in his defense.

**I.**

The petitioner contends that trial counsel "failed to establish a proper working relationship" with him because counsel failed to inform him of court dates, visit him regularly in jail, or convey a plea offer to him. The petitioner's testimony that counsel failed to visit him or convey a plea offer was contradicted by counsel's testimony that he met with the petitioner on several occasions, sometimes met with the petitioner and the petitioner's brother, and relayed to the petitioner and his brother a plea offer from the state that they rejected. The only evidence that counsel did not inform the petitioner of court dates was the petitioner's testimony that he was unaware of a pretrial date. The petitioner did not explain how he was prejudiced by counsel's alleged failure. The trial court accredited the testimony of counsel, and nothing in the record preponderates against the finding that

counsel did not fail to establish a proper working relationship with the petitioner. This issue is without merit.

## II.

The petitioner contends that trial counsel was ineffective in failing to discuss with him the investigation of the case and interviews with potential witnesses. At the post-conviction hearing, four pages of hand-written notes from counsel's interviews with potential witnesses were introduced into evidence. These notes indicated that counsel had discussed potential witnesses with the petitioner and had investigated whether those witnesses could benefit the defense. Counsel's notes reflected that the majority of those witnesses could be of no use to the defense. The petitioner acknowledged that counsel interviewed these witnesses but complained that counsel did not discuss the interviews with him, although he admitted that counsel told him that some of the witnesses would not testify at trial. The petitioner has failed to show how the alleged failure of counsel to have more in-depth discussions with him regarding witness interviews and investigation prejudiced him. On appeal, the petitioner argues that he "could not make intelligent choices regarding the defense and decision to go to trial as opposed to trying to work out a plea bargain." At the post-conviction hearing, however, the petitioner did not testify that he would have insisted on arranging a plea bargain if he had been better informed about the status of potential witnesses. In fact, the petitioner claimed that no plea offer was relayed to him. We conclude that the petitioner has not established that he was prejudiced by not receiving more information from counsel on the investigation of the case and interviews with witnesses. The petitioner is not entitled to relief on this issue.

## III.

The petitioner contends that trial counsel failed to discuss trial strategy or discovery with him adequately. Counsel testified, and the petitioner acknowledged, that his trial strategy was to negate the petitioner's ability to form the mental state required for first degree murder and that he discussed this strategy with the petitioner. The petitioner is apparently unsatisfied that counsel did not discuss other possible strategies with him. Evidence at the post-conviction hearing showed that the petitioner had no alibi defense and that the state had proof, including the petitioner's own confession, identifying the petitioner as the person who killed his wife. Counsel testified that focusing on the petitioner's obsessive-compulsive disorder and mental state after his wife left him in order to negate premeditation was the best defense available to the petitioner. Counsel developed this strategy after employing the services of two mental health professionals and interviewing several witnesses. Moreover, counsel testified that he and the petitioner discussed the petitioner's view of what happened the night the petitioner's wife was killed. Counsel's defense strategy was informed and based on adequate preparation. Counsel was not deficient in focusing primarily on this strategy.

Petitioner also contends that counsel was ineffective in failing to discuss with him the TBI report used at trial. The petitioner provides no argument as to how counsel was deficient in this regard and how he was prejudiced by this. There is no merit to this contention.

**IV.**

The petitioner contends that counsel was ineffective for failing to investigate the petitioner's prescription drug use as a possible defense to murder. The petitioner testified that at the time he shot his wife, he was taking both Zoloft and codeine. He said counsel failed to consider the interaction of these medications and how they affected his obsessive-compulsive disorder. However, aside from saying he felt that counsel should have "considered" this, he offered no evidence that a further investigation into the effects of his medications would have provided him with an effective defense. In short, the petitioner failed to show that he was prejudiced by this alleged failure. This issue is without merit.

**V.**

The petitioner faults trial counsel for not making an issue of the fifteen-minute gap in the taped interview between him and TBI Agent Jolley. The petitioner testified that during this edited portion, he discussed with Agent Jolley the medications he was taking. The petitioner acknowledged, however, that counsel attempted, unsuccessfully, to have his statements to Agent Jolley suppressed. Moreover, the petitioner did not show how raising the issue of the edited portion of the tape hurt his defense; he only states in his argument that mentioning the gap in the tape could have made the jury "very suspicious as to the accuracy" of the taped statements. The petitioner has not established that he was prejudiced, and this issue is without merit.

**VI.**

Finally, the petitioner argues that trial counsel was ineffective in failing to call Dr. Daniels to testify at trial. Counsel testified that he employed both Dr. Daniels, a psychiatrist, and Dr. McCoy, a psychologist, to evaluate the petitioner and make conclusions as to the petitioner's mental state. Counsel hoped that the doctors could substantiate the defense that the petitioner was unable to form the premeditation required for first degree murder. Counsel said that he discussed the results of the evaluation with Dr. Daniels and that Dr. Daniels was unable to say whether the petitioner could have formed premeditation at the time of the killing. Thus, counsel chose to call Dr. McCoy, who did testify that the petitioner was unable to form premeditation. The petitioner contends that not calling Dr. Daniels prejudiced him in that the state's expert witness was a psychiatrist, whereas his expert witness was a psychologist.

We conclude that counsel was not deficient in not calling Dr. Daniels to testify. Counsel had sound tactical reasons for calling Dr. McCoy and not Dr. Daniels. Furthermore, the petitioner has not shown how Dr. Daniels could have supported his defense. If a petitioner faults trial counsel for failing to call a known witness, he must prove prejudice by showing that the witness had critical evidence that was not used. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The letter written by Dr. Daniels and introduced into evidence by the petitioner stated only that had the petitioner "received appropriate treatment for his mental disorder, in all likelihood the homicide of Belinda Dickerson probably could have been avoided." It does not address the issue of whether the

petitioner could have formed premeditation, which was the issue about which counsel was most concerned. Counsel was not ineffective in failing to call Dr. Daniels at trial.

## CONCLUSION

Based on the foregoing and the record as a whole, we conclude that no error exists in the judgment of the trial court. We affirm the trial court's dismissal of the petition for post-conviction relief.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE