IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 16, 2014

**MICHAEL BO HEATH v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Sullivan County**
**No. C62330    R. Jerry Beck, Judge**

_____

**No. E2014-00590-CCA-R3-PC - Filed October 27, 2014**

_____

The Petitioner, Michael Bo Heath, appeals the Sullivan County Circuit Court's denial of his petition for post-conviction relief from his convictions for second degree murder and three counts of tampering with or fabricating evidence and his effective twenty-seven-year sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

L. Dudley Senter III, Bristol, Tennessee, for the appellant, Michael Bo Heath.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry P. Staubus, District Attorney General; and Kaylin K. Render, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's convictions relate to the fatal shooting of his mother's husband. The Petitioner was charged with first degree murder and three counts of tampering with or fabricating evidence. He pleaded guilty to second degree murder and to three counts of evidence tampering or fabricating. For second degree murder, he agreed to accept an above-range, Range II, twenty-seven-year sentence, which was to be served at 100%. He accepted six-year sentences for the evidence tampering convictions. All of the sentences were to be served concurrently.

At the post-conviction hearing, the district public defender testified that he represented the Petitioner in the early stages of the case. He met with the Petitioner on the arraignment date and had a lengthy meeting with the Petitioner at the jail before the preliminary hearing date. They reviewed the Petitioner's statement, his family history, and unspecified relevant matters. He said the Petitioner appeared to understand what was happening and participated appropriately in the discussion. Because he knew about the Petitioner's history of mental health treatment, his office had the Petitioner evaluated by an appointed psychologist.

The district public defender testified that he did not see a benefit to a preliminary hearing and that he and the Petitioner agreed without debate to waive it. He said the evidence at the hearing would have consisted of a police officer's reading the Petitioner's statement. He noted the contents of the statement would have been problematic and thought the Petitioner's assertions of a sexual relationship with his mother might generate unfavorable publicity. He thought that his investigator attempted to contact the Petitioner's mother and that she was hostile toward the Petitioner.

The district public defender testified that although he typically handled the homicide cases in the office, his workload at the time was too great due to six pending homicide cases. The Petitioner's case was reassigned to a veteran assistant district public defender, who was to serve as trial counsel. The district public defender said that when the case was reassigned, no determination had been made whether it was likely to be resolved by a plea agreement. He said that discovery had not yet been received and that the case was at a good stage for reassignment because "all the big decisions [could] still be made." He said that after reassignment, he consulted with trial counsel about the case. They discussed obtaining the services of Dr. Eric Engum for the psychological evaluation.

The district public defender testified that although he had concerns about the Petitioner's mental health based upon the Petitioner's history, he did not think he needed to adjust the manner in which he spoke to the Petitioner. He said one reason he reset the case was to have time to talk to the Petitioner when the Petitioner would not feel pressure. He considered his decisions in general sessions court and at the preliminary hearing stage to be matters of trial strategy.

The district public defender testified that in Dr. Engum's opinion, the Petitioner was not incompetent or insane. He said Dr. Engum's report did not contain any findings that implicated the Petitioner's culpable mental state. Although he did not recall specific details of Dr. Engum's report, he would not be surprised if it stated the Petitioner had diminished capacity in understanding some situations.

Trial counsel testified that after reassignment, he assumed the responsibilities of lead counsel in the Petitioner's case. He had practiced law since 1977 and had represented about five first degree murder defendants previously. After he was assigned to the case, he met with the Petitioner at the jail for two to two and one-half hours. They reviewed the Petitioner's family situation, and he explained the criminal trial process. Although counsel may not have done so in the first meeting, he explained the possible sentences the Petitioner faced for the charged offenses and the lesser included offenses. He said the Petitioner appeared to understand the information. They reviewed the mental state requirements. The Petitioner asked questions and requested case law regarding the difference between first and second degree murder. They had several discussions about "intentional" and "knowing" killings. Counsel provided books at the Petitioner's request, and the Petitioner read relevant case law. He thought the Petitioner might have used the jail's law library for research. He said they also discussed the evidence tampering charges. Although he did not recall whether the Petitioner wrote him letters, he never had the impression the Petitioner was illiterate.

Trial counsel testified that he and the Petitioner had intelligent conversations. He never thought the Petitioner did not understand anything they discussed. He said that based upon the Petitioner's history, they obtained the mental health evaluation and that the district public defender began the process for obtaining the evaluation before trial counsel had assumed responsibility for the case. He said that although Dr. Engum's findings did not provide evidence to support a defense, the findings provided information that might have been helpful as mitigation proof at sentencing. Dr. Engum was more candid when counsel spoke to him than in the written expert report. Dr. Engum suspected that the Petitioner tried to skew one portion of a test to make his mental state appear worse than it was and that the Petitioner had malingered in prior mental health commitments. According to Dr. Engum, the Petitioner was significantly impaired when making choices in social and stressful situations.

Trial counsel testified that he met with the Petitioner about five times in the approximate eighteen-month period between the preliminary and the guilty plea hearings. He thought he spent adequate time with the Petitioner in view of the charges. He said that in addition to the jail meetings, they spoke by telephone frequently. He never found the Petitioner's intelligence lacking and thought the Petitioner understood the situation and the possible outcomes.

Trial counsel testified that the first plea offer involved a thirty-year sentence, which he thought was too lengthy. Although the Petitioner was a Range I, standard offender, the first plea offer was for Range II classification. He thought the best trial strategy involved proving that the Petitioner was influenced by his emotional bond with his mother into committing the crime, which made the offense second degree murder or voluntary manslaughter rather than first degree murder. He said the Petitioner did not want to testify

-3-

and objected to a defense strategy that was unfavorable to his mother. He said they made a counteroffer for a fifteen-year sentence, and the State responded with a twenty-seven-year offer. He said the Petitioner initially rejected the twenty-seven-year offer but later asked for assurance he would not be convicted in a trial of first degree murder and receive a life sentence.

Trial counsel testified that they made another counteroffer for twenty years. The Petitioner later left a telephone message that he wanted to take the twenty-seven-year offer. Counsel met with the Petitioner at the jail, and the Petitioner said he had changed his mind and wanted a fifteen-year plea offer. Counsel thought this occurred two or three months before the trial date. He told the Petitioner that the twenty-seven-year offer was too lengthy and that they would go to trial. The Petitioner continued to be concerned about a life sentence. The Petitioner left a second telephone message stating that he wanted to accept the offer. Counsel went to the jail to discuss the offer a "day or so" later, and they reviewed the plea agreement form in detail. He said the plea hearing took place a few days later, approximately four weeks before the trial date. He said the Petitioner made a statement at the hearing that he did not shoot the victim intentionally. He thought the statement indicated the Petitioner's understanding of the difference between first and second degree murder.

Trial counsel testified that the Petitioner asked questions about whether a pending legislative bill would reduce the minimum service percentage from 85% to 65%, that he investigated it, and that he told the Petitioner no such bill was pending. He said that at the Petitioner's request, he wrote letters to the major correctional institutions requesting information about their educational and rehabilitative programs. He received a letter from one institution, which he forwarded to the Petitioner.

Trial counsel testified that although he had not talked to the witnesses, he read their statements. He did not try to talk to the Petitioner's mother because she was hostile to the Petitioner in her statement and said she was afraid of the Petitioner. He said he did not know if he would have tried to interview her because his defense strategy would have accused her of being indirectly responsible for the victim's death. He thought the only viable defense was to portray her as a manipulator, and he noted she was the only witness present when the Petitioner killed the victim.

Trial counsel testified that he was "not particularly in favor of" the plea offer because he thought the defense could offer proof of the victim's violent and controlling behavior. He said the Petitioner's half-sister was a prospective defense witness who could testify about the victim's violence. He thought the Petitioner could have been a sympathetic witness, had he testified. When asked if the Petitioner could have claimed self-defense, counsel said he thought it would have been difficult because the victim was shot multiple times, including

in the back. He acknowledged the Petitioner's pretrial statement that a person in the woods shot the victim. He noted, though, that the Petitioner told his mother, "I've set you free. I've set you free," which he thought made the manipulation of the Petitioner by the Petitioner's mother a better defense.

Trial counsel testified that he reviewed the Petitioner's two statements line by line with the Petitioner. He said he did not see a basis for suppression of the statements.

Melinda Depew, the Petitioner's mother, testified that she was married to the victim for fourteen years before his death. She said the only people with whom she spoke about the crime were a female detective and an assistant district attorney general. She said that although she was not present at the Petitioner's guilty plea hearing, she had been to all of the previous hearings.

Ms. Depew testified that she did not see the shooting because she was outside the house at the time. She said she did not see the Petitioner try to mop or change the scene after the shooting. She said she was in a bedroom and was not in a good position to see that kind of activity. She said that the victim had filled a bucket with bleach the day before the shooting and that it was still in the kitchen on the day of the crime.

Ms. Depew testified that the victim was about 6'3", weighed about 240 pounds, and was thirty-six years old. She described the Petitioner as "[v]ery small" and "[v]ery meek." She said the Petitioner had lived with her and the victim for about two years before the crime. She said the victim bullied the Petitioner, took money from him, and became angry and "jump[ed] on" the Petitioner when the Petitioner tried to wash dishes. She said the victim "smacked [the Petitioner] to the floor" a couple of times, threatened to kill the Petitioner, told the Petitioner he was "crap," and said he would destroy the Petitioner's belongings. She said the victim threatened her life many times. She said that the victim threatened her with the use of a gun many times and that the Petitioner could have overheard the threats. She did not think the victim threatened the Petitioner with the use of a gun. She said that the Petitioner expressed concern the victim would kill her and the Petitioner and that he wanted her to leave the victim.

Ms. Depew testified that she had been released from the hospital about two weeks before the victim was shot. She said that after her release, she stayed in the bedroom when she was not cooking, but she described the Petitioner and the victim's relationship as being the same as it had been previously.

Ms. Depew testified that on the night of the shooting, she and the victim argued. The victim left the house but returned around 2:00 a.m. She said he had not been violent. She

said that after he returned, she left the house to buy cigarettes and heard gunshots after she went outside. She heard the victim say, "You shot me, you little son-of-a-b----." She agreed the Petitioner took the telephone from her repeatedly when she tried to call 9-1-1 from the kitchen and said she went to the bedroom in order to make the call. She said the Petitioner left the bedroom briefly, and she went to check the victim's pulse. She said the Petitioner was in the bedroom most of the time. She did not see him clean the scene, and she did not see a large amount of blood. She did not know if the Petitioner showed the police a gun hidden in a vent.

Ms. Depew testified that the victim occasionally took Xanax that was not prescribed to him and that he did not drink alcohol. She did not know if he had taken Xanax on the night he was killed. She acknowledged she sometimes took Xanax that was not prescribed to her. She agreed she had been hospitalized with a brain aneurism until two weeks before the shooting and acknowledged she was taking prescribed medication on the date of the shooting.

Ms. Depew testified that the Petitioner and the victim blamed each other in disagreements. She agreed the Petitioner was an adult and did not have to stay at her house. She agreed that she wanted him to leave and that he stayed because he was "obsessed" with her. She acknowledged the statement she gave after the shooting in which she said she thought the Petitioner might shoot her that night, and she said that although the thought entered her mind, she did not "think it was quite that way."

Ms. Depew testified that the Petitioner was "low functioning," had been hospitalized in mental institutions repeatedly, had been diagnosed as borderline schizophrenic, and "didn't make a lot of sense when you would talk to him." She had tried to help the Petitioner get a place to live and a car, but he could not function independently. She said the Petitioner was "book smart" but did not understand social cues. She said she did not take the victim's threats toward her seriously, but the Petitioner did not understand that she was not in danger.

When asked about her statement to the police that she thought the Petitioner might shoot her, Ms. Depew testified that she and the Petitioner argued after the shooting while she was on the telephone and that the person on the telephone told her not to argue with him. She did not think the Petitioner understood what was happening when he was "in trouble" previously or that he understood what was happening in the present case.

Ms. Depew acknowledged that she threw the Petitioner out of the house about six months before the crime, and she agreed the victim allowed the Petitioner to return and gave him a job. She acknowledged signing a written statement in which she said she was afraid the Petitioner would shoot her on the night of the victim's death. She said, though, that the

-6-

officer wrote the statement and that although she signed it, her vision was poor, and she did not recall reading it closely. She said that she was "kind of afraid" immediately after the Petitioner shot the victim but that she was not afraid after she assessed the situation.

The Petitioner testified that he wanted a trial, that he understood he could get "life or 40 years or whatever the case is," and that he had not wanted initially to accept a plea offer. He said he was scared of "getting life or death" and did not think he had enough time to get a new attorney or a different plea offer or to think about the offer he had. He said he was not afraid of trial counsel but was afraid counsel would be mad at him. He wanted a different attorney and did not want to "go against" his mother. He said counsel did not fully explain his trial strategy, and he did not think counsel knew how to proceed.

The Petitioner testified that after he was in prison and on proper medication, he was able to think about the plea agreement. He wanted to "do things over without making mistakes." He said he "didn't really understand" the plea agreement or if he could refuse it and continue negotiating for a more favorable disposition. He said that if he had known at the time of the plea what he learned later, he would not have pleaded guilty. He thought he would have asked the trial court for a different attorney, would have asked for a more favorable plea offer, and would have requested more time to think and "do some studying."

The Petitioner testified that on the night of the victim's death, he was afraid of the victim. He said the victim threatened to kill him and his mother and had a different look on his face than he had previously. The Petitioner said he was afraid for his mother's and his lives. He said the victim "came at" him, and he had no place to go. He said he took a gun, which he planned to use to kill himself, out of his pocket and pointed it at the victim. He said he closed his eyes, and before he realized what was happening, the bullets had been fired. When he opened his eyes, the victim was standing but then fell. The victim stood again and ran.

The Petitioner testified that earlier in the evening, he contemplated suicide, cut his wrists, inhaled metal adhesive, and held a rifle to his head. He said he thought he could get a handgun from his mother and have a better chance of killing himself with it than if he used the rifle. He said that he told trial counsel some of this information but that counsel did not seem to think it was relevant.

The Petitioner testified that the house had only one door. The victim and his mother were outside the door. He said the victim was "threatening her or hurting her or whatever happened." He said the house had no back door or window from which he could escape. He said he heard the door slam and saw the victim "running after" him. He said he had no time to think or react. He said he and the victim had been in numerous fights in the past. He

stated that the victim pointed guns at him and his mother and said he would shoot them. He said that he had no place to go to get away from the victim's control and that "they" were taking his money. He said that he thought he would die that night and that either the victim would kill him or he would commit suicide. He planned to kill himself and was waiting for the victim and his mother to leave to go to a methadone clinic.

On cross-examination, the Petitioner acknowledged that he and the victim "had words" on the night of the crime. He agreed that he knew the victim had guns and knives in the house but was unaware if the victim was armed that night. He said he did not know if the victim had already killed his mother outside.

When questioned about his pretrial statement, the Petitioner testified that he had said the victim told him before the shooting to "[l]et them ring out." He said he did not fully understand what the victim meant at the time. He agreed with his statement that he shot the victim in the kitchen and "put a few in his back."

The Petitioner testified that trial counsel came to see him about the plea offer after he made telephone calls to counsel. He said that he always had to call counsel to initiate a meeting and that counsel never came to see him otherwise. He said that counsel did not review discovery with him when counsel was first assigned and that he was scared to express concerns to the trial court. He was unsure if he could get a different attorney or if anyone would listen to him.

The Petitioner testified that although trial counsel reviewed the plea paperwork with him, he did not understand what he was doing. He acknowledged he signed the documents and said he did not think the trial judge read everything to him at the plea hearing. He did not recall if the judge reviewed his rights with him. He acknowledged counsel brought him books but said they were outdated.

On redirect examination, the Petitioner testified that the victim was strong and would not have needed a gun to kill him. He said he could not have defended himself physically from the victim. He thought he had a viable defense that he was defending himself and his mother. He acknowledged telling a detective he had washed and bleached his hands and mopped the floor with bleach.

The Petitioner testified that trial counsel tried to explain the trial process, but the Petitioner did not understand. He said his habit was to ask questions repeatedly, and he thought counsel would be mad at him if he said he did not understand or if counsel had to repeat himself. The Petitioner said he was anxious, cold, shaking, and afraid at the post-conviction hearing.

The Petitioner testified that when he made his statement in the allocution at his guilty plea hearing that he did not wait for the victim or shoot him intentionally, he was trying to let the trial court know he did not want to proceed. He said he was "book smart" but did not understand social situations and cues.

On rebuttal, trial counsel testified that he and the Petitioner discussed a self-defense theory. He said that he talked to Dr. Engum more than once and that he provided Dr. Engum with the discovery materials and the Petitioner's medical records. He said Dr. Engum was unable to get the Petitioner to state why he took action on the date of the shooting but not on previous occasions. He said that the Petitioner never expressed dissatisfaction with his representation and that they had a good rapport.

The post-conviction court credited trial counsel's testimony. It found that the Petitioner wanted counsel to predict the outcome of a trial, which counsel could not do. The court read at length from the Petitioner's pretrial statement. It noted the Petitioner's assertions in the statement: The victim told the Petitioner to "let them ring out." The victim and Ms. Depew argued. The victim left the house for a while, and the Petitioner shot the victim after the victim returned. The Petitioner did Ms. Depew a favor. The victim fussed at the Petitioner about a cigarette-rolling machine. The victim was pushing the Petitioner to his breaking point. The victim did not want the Petitioner at the house because of the manner in which the victim treated Ms. Depew. The victim told the Petitioner he was uncooperative. The Petitioner claimed to have had an inappropriate relationship with his mother, and the victim was jealous of his love for Ms. Depew.

The post-conviction court also read from Ms. Depew's statement, noting the following: The Petitioner came into the bedroom and said he had freed Ms. Depew and himself. The Petitioner said someone in the woods shot the victim. The Petitioner said Ms. Depew and the victim made him crazy, and the shooting was their fault. The Petitioner molested a family member when he and the family member were children, and he attempted to molest another family member. The Petitioner's claim that he and Ms. Depew had an inappropriate relationship was false, and she threw him out of the house over it. The Petitioner wanted to marry her, and the victim and Ms. Depew had conflict over the situation. Ms. Depew was afraid of the Petitioner on the night of the shooting. She had worried about the Petitioner shooting the victim and had put all the small guns in the bedroom. The Petitioner could be violent, and Ms. Depew did not like to leave him alone with her dogs.

The post-conviction court found that Ms. Depew would have been a hostile witness. The court observed that it could not imagine an attorney calling Ms. Depew as a defense witness and noted that the State might have called her. It noted the Petitioner's desire not to be in an adversarial position with his mother. The court found that the parties' plea

negotiations appeared to have come to an end and that the trial date was approaching. The Petitioner was equivocal but eventually decided to accept the plea offer, despite trial counsel's thoughts that the plea agreement was unfavorable and that he might have been able to present an argument for voluntary manslaughter. The court noted that Dr. Engum let counsel know that if Dr. Engum were cross-examined, he might have been asked about evidence that the Petitioner was malingering in the psychological testing. The court denied post-conviction relief.

The post-conviction court also filed a written order in which it credited the district public defender's testimony that he knew the State's only evidence at a preliminary hearing would have consisted of a detective's reading the Petitioner's statement. The court noted that the Petitioner failed to identify any prejudice from the decision to waive the preliminary hearing. The court's order also addressed the ineffective assistance of counsel claim relative to the decision not to interview Ms. Depew, and the court's findings and conclusions were consistent with its ruling from the bench.

A post-conviction petitioner has the burden of proving his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings regarding whether an attorney performed deficiently and whether a petitioner was prejudiced by any deficient performance is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58. Post-conviction relief is appropriate when a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

To establish a claim of ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. To establish the performance prong, a petitioner must identify counsel's acts or omissions that "are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. The court must determine if these acts or omissions, viewed in light of all of the

circumstances, fell "outside the wide range of professionally competent assistance." *Id*. To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner contends that his attorneys were ineffective by waiving the preliminary hearing and failing to interview Ms. Depew to determine whether she would have been a hostile witness or whether her testimony would have supported a self-defense theory. Regarding the preliminary hearing claim, the district public defender testified that he saw no benefit to a preliminary hearing and that he thought it might generate unfavorable publicity. He knew the evidence the State would offer. The Petitioner agreed to waive the hearing. Counsel made an informed, strategic decision and obtained the Petitioner's consent to waive the hearing. The Petitioner has not shown that the evidence preponderates against the post-conviction court's factual findings relative to counsel's waiving the preliminary hearing, nor has the Petitioner shown that the court erred in concluding that counsel was not ineffective by waiving the preliminary hearing. The Petitioner is not entitled to relief on this basis.

Regarding the decision not to interview Ms. Depew, the post-conviction court found that she would have been a hostile witness, and the evidence does not preponderate against this determination. The Petitioner killed Ms. Depew's husband. A rivalry existed between the Petitioner and the victim regarding Ms. Depew. The Petitioner made allegations about an inappropriate relationship between himself and Ms. Depew, which Ms. Depew denied. Ms. Depew said in a statement that she thought the Petitioner was obsessed with her and wanted to marry her. She told the police she had been afraid of the Petitioner on the night of the shooting. The Petitioner's attorneys had Ms. Depew's pretrial statements. Although the Petitioner argues that interviewing Ms. Depew would have provided information to support a self-defense theory, trial counsel testified that he thought the best defense was to characterize Ms. Depew as a manipulator. Counsel considered a self-defense approach, but the Petitioner's and Ms. Depew's statements provided evidence that would have undermined a self-defense theory. The court did not err in concluding that counsel's performance in deciding not to interview Ms. Depew and in choosing a defense strategy that was consistent with her hostility toward the Petitioner was within the range of competent professional assistance.

We conclude that the Petitioner is not entitled to relief. The judgment of the post-conviction court is affirmed.

_____

ROBERT H. MONTGOMERY, JR., JUDGE